Joshua R. Purtle
Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax
jpurtle@earthjustice.org
tpreso@earthjustice.org

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| SWAN VIEW COALITION and FRIENDS OF THE WILD SWAN, | ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| DAVID BERNHARDT, Secretary of the Interior; MARGARET EVERSON, Acting Director of the U.S. Fish and Wildlife Service; U.S. FISH AND WILDLIFE SERVICE; VICKI CHRISTIANSEN, Chief of the U.S. Forest Service; CHIP WEBER, Forest Supervisor, Flathead National Forest; U.S. FOREST SERVICE, | ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) ) |

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiffs in this case challenge the U.S. Forest Service's 2018 Land Management Plan for the Flathead National Forest ("Revised Forest Plan"), which abandoned key habitat protections for threatened grizzly bears and bull trout without legally required environmental analysis and public disclosure.

2.      The Flathead National Forest includes 2.4 million acres of public land in northwest Montana.  It has long provided a sanctuary for threatened grizzly bears and bull trout in the Northern Rockies.  However, the Flathead's value to these species depends in large part on the fact that much of the Forest has remained relatively free of roads, and the human intrusion and sediment pollution that roads engender.

3.      Under longstanding Flathead National Forest Plan direction, the Forest Service was required to limit the number of roads and to reclaim excess roads in grizzly bear and bull trout habitat.  Further, the Forest Service was required to compensate for any new roads it built by fully reclaiming other roads in the Forest according to stringent measures, thus ensuring no net increase in the total number of roads in the Flathead.

4.      The 2018 Revised Plan, which replaced former Forest Plan requirements, asserted that the Forest Service will substantially comply with these road management standards going forward by maintaining habitat conditions that

1

existed in 2011.  However, this assertion is deceptive, because the Revised Plan moved the goal posts on what is required to "reclaim" a road.  Under the Revised Plan, the Forest Service can build new roads throughout much of the Forest, as long as it "reclaims" other roads by placing a minimal barrier that blocks or obscures the entrances of those roads.  Thus, roads purportedly "reclaimed" under the Revised Forest Plan may remain on the landscape indefinitely, causing long-lasting harm to threatened species.  This permissive new management direction is a far cry from former requirements, which demanded that a road be treated such that the road would "no longer function as a road" before it could be considered reclaimed, and new roads could be built elsewhere in the Forest.  Flathead National Forest, Forest Plan Amendment #19, Amended Environmental Assessment, app. D at 2 (Mar. 1995) ("Amendment 19 EA").  Further, as to roadbuilding in bull trout habitat, the Revised Plan replaced a formerly mandatory limit on new road construction in the majority of the Forest with a voluntary guideline of limited geographic scope that provides no meaningful protection for the region's struggling bull trout population, and weakened requirements for monitoring culverts under abandoned roads in the Forest.

5.     These changes in the Flathead's forest management direction threaten significant new harm to grizzly bears and bull trout in the Flathead.  The new roadbuilding and minimal reclamation contemplated by the Revised Plan enables

motor vehicle and human trespass on new and putatively closed roads, causing

disturbance in formerly secure grizzly bear habitat.  Further, research has shown

that grizzly bears avoid roads—including roads closed to public travel—and

therefore may be displaced from roaded habitat, whether or not people use the

roads.  Such displacement harms grizzly bear reproduction and survival.  Roads

also threaten bull trout because they generate sediment that pollutes formerly

pristine bull trout streams.  Culverts under abandoned roads in particular can

become a significant source of pollution when they inevitably clog and fail,

causing erosion and sedimentation in adjacent waterways.

6.      The Revised Plan thus fundamentally altered the regulatory landscape

for grizzly bears and bull trout in the Flathead National Forest, purporting to

uphold key habitat requirements with one hand while undermining those same

protections with the other.  In doing so, it ran afoul of governing legal

requirements in the National Environmental Policy Act ("NEPA") and the

Endangered Species Act ("ESA").

7.      Under NEPA, the Forest Service was required to analyze and disclose

all the environmental impacts of the Revised Forest Plan's new management

direction, including its new standards for roadbuilding.  Further, as to threatened

species like bull trout and grizzly bears, the ESA and Administrative Procedure

Act ("APA") required the Forest Service and U.S. Fish and Wildlife Service

("FWS") to consider all relevant factors that may affect the conservation of these species, including the impact of potential new roadbuilding, before concluding that the Revised Forest Plan will not jeopardize the survival of these species.

8.     The Forest Service and FWS failed to meet these requirements.  The Final Environmental Impact Statement and Biological Opinion for the Revised Forest Plan failed to rationally address the impacts of the Revised Plan's new management direction on grizzly bears and bull trout.  The federal agencies have thus moved forward with the Flathead's harmful new management direction without grappling with the consequences of that decision, as governing law requires.

9.     To protect bull trout and grizzly bears from the unexamined harms threatened by new roads allowed under the Flathead's Revised Forest Plan, Plaintiffs now turn to this Court for relief.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action pursuant to the ESA, 16 U.S.C. § 1540(g)(1), and the APA, 5 U.S.C. § 706(2), which waive the defendants' sovereign immunity.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

11.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiffs Swan View Coalition and Friends of the Wild Swan reside in this District, the ESA and NEPA violations alleged in this Complaint occurred in this District, and Defendant Chip Weber resides in this District.  Venue is proper in the Missoula Division of this District because a substantial part of Plaintiffs' claims arose in Flathead County.  See Mont. Code Ann. § 25-2-125; see also Local Civ. R. 1.2(c)(5), 3.2(b).

12.     Plaintiffs provided defendants with 60 days' written notice of Plaintiffs' intent to sue on February 8, 2019, as required by 16 U.S.C. § 1540(g)(2).

## PARTIES

13.     Plaintiff Swan View Coalition is a non-profit conservation organization dedicated to conserving water quality and quiet, secure habitats for fish, wildlife, and people on the Flathead National Forest and greater Flathead River Basin.  The Coalition's office is located in Kalispell, Montana, in Flathead County.  The Coalition brings this action on its own behalf and on behalf of its adversely affected members.

14.     Plaintiff Friends of the Wild Swan is a non-profit organization with its principal place of business in Swan Lake, Lake County, Montana.  Friends of the Wild Swan is dedicated to the conservation of water quality, fish and wildlife

5

habitat, and biological integrity of the Flathead National Forest.  Friends of the Wild Swan brings this action on its own behalf and on behalf of its adversely affected members.

15.     All plaintiffs have long-standing interests in the preservation and recovery of grizzly bears and bull trout in the Northern Continental Divide Ecosystem, which encompasses the Flathead National Forest, both because they and their members place a high value on these species, and because the presence of grizzly bears and bull trout is essential to the healthy functioning of the ecosystem. Plaintiffs have been active in seeking to protect and recover grizzly bears and bull trout through a wide array of actions, including public outreach and education, scientific analysis, and advocacy intended to promote achievement of healthy ecosystem functioning in the region.

16.     The members of each of the Plaintiffs also use the Flathead National Forest for traditional activities and recreational pursuits, including hiking, camping, backpacking, wildlife viewing, and aesthetic enjoyment.  In so doing, Plaintiffs' members and staff seek to observe, photograph, and study grizzly bears and bull trout in their native habitat.  Plaintiffs derive aesthetic, recreational, scientific, inspirational, and other benefits from these activities.

17.     The challenged Revised Forest Plan will reduce opportunities for Plaintiffs' members to experience grizzly bears and bull trout in the wild in the

Flathead National Forest, because new management direction under the Forest Plan will degrade grizzly bear and bull trout habitat and displace these species from areas that Plaintiffs' members use to observe, photograph, and study them.  The legal violations alleged in this complaint therefore cause direct injury to the aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests of Plaintiffs and their members.

18.     Plaintiffs' aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law.  These are actual, concrete injuries, traceable to Defendants' conduct, that would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

19.     Defendant David Bernhardt is the U.S. Secretary of the Interior.  In that capacity, Defendant Bernhardt has supervisory responsibility over FWS.  The Secretary of the Interior is the federal official vested with responsibility for properly carrying out the ESA with respect to terrestrial mammals such as grizzly bears and freshwater fish such as bull trout.  Defendant Bernhardt is sued in his official capacity.

20.     Defendant Margaret Everson is the Acting Director of the U.S. Fish and Wildlife Service.  In that capacity, Defendant Everson has supervisory responsibility over FWS and FWS's administration of the ESA.

21.     Defendant FWS is a federal agency within the Department of the Interior.  FWS is responsible for administering the ESA with respect to terrestrial wildlife such as grizzly bears and freshwater fish such as bull trout.

22.     Defendant Vicki Christiansen is the Chief of the U.S. Forest Service. In that capacity, Defendant Christiansen has supervisory responsibility over the Forest Service's management of national forest lands, including the Flathead National Forest, and the Forest Service's compliance with ESA and NEPA requirements.  Defendant Christiansen is sued in her official capacity.

23.     Defendant Chip Weber is the Forest Supervisor for the Flathead National Forest.  In that capacity, Defendant Weber is responsible for the management of the Flathead National Forest and the Forest's compliance with ESA and NEPA requirements.  Defendant Weber is sued in his official capacity.

24.     Defendant U.S. Forest Service is a federal agency within the Department of Agriculture.  The Forest Service is responsible for managing National Forest lands, including the Flathead National Forest, and ensuring that Forest Service activity complies with the ESA and NEPA.

8

## LEGAL BACKGROUND

## I.   ENDANGERED SPECIES ACT

25.    "The ESA is 'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'  It represents a commitment 'to halt and reverse the trend toward species extinction, whatever the cost.'"  Ctr. for Biological Diversity v. Zinke, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted).

26.    To that end, section 7(a)(2) of the Act imposes on federal agencies such as the Forest Service a duty to ensure that actions they authorize or carry out are not likely to jeopardize listed species or destroy or adversely modify critical habitat designated for such species.  16 U.S.C. § 1536(a)(2).  An agency action "jeopardizes" a protected species if it "reasonably would be expected, directly or indirectly," to reduce appreciably the species' likelihood of survival or recovery "by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02; see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 932 (9th Cir. 2008).

27.    Before undertaking or authorizing an action that may affect ESA-listed species or their critical habitat, the Forest Service must consult with the appropriate expert fish and wildlife agency, which is FWS in the case of grizzly bears and bull trout.  See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b).  The

formal consultation process culminates in FWS's issuance of a biological opinion, reflecting FWS's determination—based on "the best scientific and commercial data available"—of whether the proposed action will jeopardize a listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2), (b)(3)(A); see 50 C.F.R. § 402.14. In making that determination, FWS must "consider[ ] the relevant factors and articulate[ ] a rational connection between the facts found and the choice made." Ctr. for Biological Diversity v. BLM, 698 F.3d 1101, 1121 (9th Cir. 2012) (quotation omitted).

28.    If FWS concludes that a proposed action is likely to jeopardize a listed species, the action may not proceed. See 16 U.S.C. § 1536(a)(2). FWS must determine whether "reasonable and prudent alternatives" exist that would avoid jeopardy. Id. § 1536(b)(3)(A).

29.    If FWS concludes that implementing a proposed action (or a reasonable and prudent alternative) will not jeopardize a protected species but will nevertheless result in "take" of such species, the agency must issue an incidental take statement with its biological opinion. 50 C.F.R. § 402.14(i)(1). Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Sections 9 and 10 of the ESA prohibit the taking of listed species unless specifically authorized in an incidental take statement. Id.

§§ 1538(a)(1)(B), 1539; <u>see also</u> 50 C.F.R. §§ 17.40(b), 17.44(w) (regulations concerning take of grizzly bears and bull trout).

30.     The Forest Service violates the ESA if it approves or implements an action in reliance on a legally flawed biological opinion or fails in its approval or implementation decision "to discuss information that would undercut the [biological] opinion's conclusion." <u>Ctr. for Biological Diversity v. BLM</u>, 698 F.3d at 1127-28; <u>accord</u> <u>Save Our Cabinets v. U.S. Fish & Wildlife Serv.</u>, 255 F. Supp. 3d 1035, 1063 (D. Mont. 2017).

## II.     NATIONAL ENVIRONMENTAL POLICY ACT

31.     NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  NEPA has two fundamental purposes: (1) to guarantee that agencies take a "hard look" at the consequences of their actions before the actions occur by ensuring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts"; and (2) to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989).  "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that 'the agency will not

act on incomplete information, only to regret its decision after it is too late to

correct.'" Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208,

1216 (9th Cir. 1998) (citation omitted).  To that end, NEPA requires agencies to

disclose and consider all the expected environmental impacts of a proposed agency

action.  See Mont. Wilderness Ass'n v. McAllister, 666 F.3d 549, 560 (9th Cir.

2011) (concluding that agency violated NEPA where it failed "to consider the

impact of increased" motorized use on the wilderness character of a wilderness

study area).

      32.    Pursuant to NEPA,

> all agencies of the Federal Government shall … include in every
> recommendation or report on … major Federal actions significantly
> affecting the quality of the human environment, a detailed statement
> … on – (i) the environmental impact of the proposed action, (ii) any
> adverse environmental effects which cannot be avoided should the
> proposal be implemented, [and] (iii) alternatives to the proposed
> action,

including a no-action alternative that maintains the status quo.  42 U.S.C.

§ 4332(2); 40 C.F.R. § 1502.14.  This environmental impact statement ("EIS")

helps to ensure "that environmental concerns [will] be integrated into the very

process of agency decision-making."  Andrus v. Sierra Club, 442 U.S. 347, 350

(1979).

## THREATENED GRIZZLY BEARS

33.     The grizzly bear, Ursus arctos horribilis, once numbered roughly 50,000 individuals in the western United States.  Before European-American settlement of the American West, grizzly bears roamed from the Great Plains to the Pacific coast, inhabiting all but the hottest and most arid desert lands.  Grizzlies fed on bison carcasses in the Great Plains and beached whales on the Pacific coast. They played central roles in the functioning of a wide variety of ecosystems as well as in the cultural and spiritual beliefs and practices of many native peoples. With European-American settlement, however, grizzlies were "shot, poisoned, and trapped wherever they were found," eliminating them from all but mountain redoubts far removed from human intolerance.  Crow Indian Tribe v. United States, 343 F. Supp. 3d 999, 1004 (D. Mont. 2018) (quotation omitted).

34.     In an historical blink of an eye, humans reduced the range of grizzly bears by more than 98%, isolating the remaining bears in a few remnant islands of wild country.  By the 1930s, the grizzly bear population in the continental United States had plummeted to fewer than 1,000 individuals.  Recognizing the imperiled status of the species, FWS listed grizzly bears throughout the lower-48 United States as a threatened species under the ESA in 1975, two years after the Act was passed.  Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975).

35.     Conservation efforts under the ESA have helped bring grizzly bears back from the brink, but the species remains confined to a few isolated populations in the northwest United States.  One of these remnant populations occurs in the Northern Continental Divide Ecosystem, a large block of public land extending from Glacier National Park south to the mountains near Missoula.

36.     The Flathead National Forest, which encompasses 2.4 million acres of public land in northwest Montana, makes up a significant portion of the Northern Continental Divide Ecosystem and provides important habitat for grizzly bears.

37.     The value of that habitat, however, hinges on the fact that much of the Flathead has remained a largely unroaded landscape.  Roads—and the motor vehicle and human intrusion those roads allow—are one of the principal threats that grizzly bears continue to face in the Northern Rockies today.  As seminal research by Richard Mace and Timothy Manley in the 1990s demonstrated, the presence of roads in grizzly bear habitat negatively impact bears' survival.  This is because grizzly bears avoid roads, adjusting "their habitat use patterns in part" according to the density of roads in an area.  Mace & Manley, South Fork Flathead River Grizzly Bear Project:  Progress Report for 1992, at 25 (Apr. 1993) ("Mace & Manley 1993").  Researchers even observed bear "avoidance of high total road densities areas" where "roads were closed to public travel."  Mace & Waller, Final Report:  Grizzly Bear Ecology in the Swan Mountains, Montana, at 72-73 (1997).

14

FWS itself acknowledged in a biological opinion analyzing some of this research that bears encountering vehicles, vehicle noise, and human noise associated with roads "learn to avoid the disturbance and annoyance generated by roads," and "may not change this resultant avoidance behavior for long periods after road closures and lack of negative reenforcement."  FWS, Biological Opinion on Amendment 19 to the Flathead National Forest Plan, at 15 (Jan. 6, 1995).  Mace and Manley concluded that their findings concerning bear avoidance of roaded areas "suggest that if unroaded habitats are reduced in quantity or size, the number of adult females will eventually decline," thus harming the grizzly bear population as a whole.  Mace & Manley 1993 at 26.

38.     In response to this research and a public campaign to protect grizzly bears from the threat of human intrusion, in 1995 the Forest Service issued Forest Plan Amendment 19 for the Flathead National Forest.  This Amendment set limits on the density of roads—that is, the miles of road length per square mile of Forest—allowed in key grizzly bear habitat.  Specifically, Amendment 19 allowed "no net increase in total motorized access density greater than 2 miles per square mile" and "no net increase in open motorized access density greater than 1 mile per square mile" in bear management subunits throughout the Forest.[1]  Flathead

---

[1] A bear management subunit is a subdivision of the Northern Continental Divide Ecosystem "representing the approximate size of an average annual female grizzly bear home range."  Revised Forest Plan at 172.

National Forest, Forest Plan Amendment #19, Decision Notice, at 4 (Mar. 1995)

("Amendment 19 Decision Notice").  Further, Amendment 19 required the Forest

Service to "limit high-density (> 1 mile/square mile) open motorized access to no

more than 19 percent" of a bear management subunit "within 5 years" and "limit

high-density (> 2 miles/square mile) total motorized access to … no more than 19

percent in 10 years." Id.  Total motorized access density includes all roads that

have not been fully reclaimed, while open motorized access density includes all

roads that are open to public use during times of year when grizzly bears are active

and out of their dens.  Amendment 19 EA, app. D at 2-3 (Mar. 1995).  In addition

to these road density limits, Amendment 19 also provided that roads and trails

within "security core" grizzly bear habitat "may not receive high levels of non-

motorized use." Id. at 3.

     39.    At the time the Forest Service issued Amendment 19, many Flathead

Forest bear management subunits did not meet these road density standards.

Amendment 19 thus required the Forest Service to reclaim existing roads in these

areas.  Further, to meet the no net increase standard, the Forest Service was

required to compensate for any new road construction by reclaiming existing roads

elsewhere in the same bear management subunit.  Under Amendment 19, such

reclaimed roads could be excluded from total motorized access density only if they

met stringent requirements:  at a minimum, the Service had to treat the first 200 to

600 feet of the road "to preclude its use as a motorized or non-motorized travel way"; revegetate and scatter natural debris on the remainder of the road; and remove all stream-aligned culverts under the road.[2]  Amendment 19 EA, app. D at 2.  Such treatment was intended to make the "reclaimed road no longer function as a road again." Id. at 3.  Since 1995, the Service has decommissioned and removed from its road system about 730 miles of roads in this manner, but 518 miles of roads still need to be reclaimed to meet the Amendment 19 standards.  Flathead National Forest, Final Environmental Impact Statement for Land Management Plan, vol. 2 at 143, 167 (Nov. 2018) ("Final EIS").[3]

40.    These stringent reclamation requirements are essential to ensuring that habitat in the Flathead remains secure for grizzly bears.  As discussed, grizzly bears are displaced from roaded areas even when the roads are closed to public travel, and that displacement can impair their ability to survive and reproduce. Therefore, even administratively closed roads will continue to harm grizzly bears until they are fully removed from the landscape, as Amendment 19 required.

_____

[2] A culvert is a structure, often made from a large pipe, that allows water to flow under a road or trail.

[3] The Amendment 19 reclamation requirements are consistent with the National Forest Management Act, which instructs the Forest Service to design new roads "with the goal of reestablishing vegetative cover on the roadway … within ten years after" the road is no longer needed. 16 U.S.C. § 1608(b).

## THREATENED BULL TROUT

41.     The bull trout, <u>Salvelinus</u> <u>confluentus</u>, is a migratory char (a close relative of trout) in the salmonid family.  Historically, bull trout thrived in major river drainages from northern California and Nevada north to Alaska, and from Puget Sound on the Pacific coast east to Montana and Alberta.

42.     FWS listed bull trout across the lower-48 United States as a threatened species under the ESA in 1999.  By the time of the listing decision, bull trout had been extirpated from approximately 60 percent of their historic range. In 2010, FWS designated critical habitat for bull trout, which included many creeks and other watersheds within and downstream from the Flathead National Forest.  <u>See</u> Final Rule, Revised Designation of Critical Habitat for Bull Trout in the Coterminous United States, 75 Fed. Reg. 63,898 (Oct. 18, 2010).

43.     The coterminous United States population of bull trout comprises 109 occupied core areas, each of which plays an important role in the conservation of the species as a whole.  In 2005, even with ESA protections in place, FWS concluded that approximately 72% of bull trout core area populations were at risk or at high risk of extirpation.  In its 2005 analysis, FWS determined that just 3.3% of core area populations across the species' range were at low risk of extirpation.

44.     As described by FWS, "a wide variety of factors" threaten bull trout across their range, including habitat degradation and fragmentation; reduced

stream flows; road construction and maintenance, mining, and grazing activities;

blockage of migratory corridors by dams and other structures; poor water quality;

competition with and predation by nonnative fish species; intentional or incidental

killing of bull trout by anglers; and climate change.  FWS, Biological Opinion on

the Revised Forest Plan for the Flathead National Forest, at II-5-6 (Nov. 22, 2017)

("Flathead Biological Opinion").

45.     Habitat loss in particular is one of "the most significant primary threat

factors affecting bull trout."  FWS, Recovery Plan for the Coterminous United

States Population of Bull Trout, at iv (2015) ("Bull Trout Recovery Plan").

Compared to other salmonid fish species, "bull trout generally have the most

specific habitat requirements":  To spawn, develop, and survive, bull trout need

water that is very cold and very clean.  Id.

46.     Sediment, for example, can impair the species' reproduction if it

pollutes bull trout streams:

> When fine sediments enter streams at levels beyond natural
> background conditions, they can accumulate within spawning gravels
> and reduce survival of eggs and embryos (Pratt 1992) by impairing
> their access to oxygenated water, as well as negatively affecting
> juveniles and adults by interfering with foraging, clogging gills,
> physically abrading tissues, and disrupting orientation and movement
> patterns.

Bull Trout Recovery Plan at 26.  Sediment can also "lead to changes in channel

morphology and water temperature," Flathead Biological Opinion at II-46, thus

threatening to render an impacted stream uninhabitable to bull trout, which have

"extremely low tolerance for warm water temperatures."  Bull Trout Recovery

Plan at 26.

47.     Roads built in bull trout watersheds—including roads closed to human

travel—are a major source of harmful sediment for bull trout streams.  "Sediment

from the road system can be delivered to streams by direct erosion of cut and fill

slopes associated with stream crossings or by surface runoff from roads and ditches

that carries sediment-laden water directly or indirectly to streams."  Flathead

Biological Opinion at II-46.  Further, stream-aligned culverts supporting a road can

trap debris and, over time, fail, causing the stream to run over the roadbed with

associated erosion and sedimentation.  As FWS has acknowledged, such culvert

failure is inevitable if culverts are not removed:  "Whatever the design life, any

crossing structure would have a 100% chance of failure over its installation life if it

is not removed after the road is abandoned."  FWS, Biological Opinion on the

Effects of the Moose Post-Fire Project on Bull Trout, at 40 (Nov. 14, 2002).

Addressing the threat of sedimentation from roads therefore requires, according to

FWS, "maintaining bridges, culverts, and [stream] crossings" and

"decommissioning surplus roads and removing culverts and bridges on closed

roads."  Bull Trout Recovery Plan at 26.

48.     Until recently, Amendment 19 required the Forest Service to do just

that:  as discussed, the Amendment limited the number of roads in the Flathead and

further required the Forest Service to reclaim roads in grizzly bear habitat

throughout the Forest.  In the process, the Forest Service would remove culverts

under the reclaimed roads, thus preventing catastrophic culvert failure in bull trout

watersheds.  Road management under Amendment 19 thus helped to mitigate the

threat sediment pollution poses to bull trout and their critical habitat.  Accordingly,

although Amendment 19's primary purpose was to protect grizzly bears, the Forest

Service has also concluded that the Amendment 19 standards help to conserve bull

trout and other fish species in the Forest.

49.     In addition to the Amendment 19 requirements, the Forest Service

also addressed the threat of sedimentation by annually monitoring existing culverts

on closed roads throughout the Forest.  This former monitoring program, which

was required by a series of biological opinions for bull trout, helped ensure that the

Forest Service could remove or unclog problem culverts before the culverts failed

and caused harmful sedimentation.  The annual culvert monitoring requirement

thus also helped to protect threatened bull trout in the Forest.

## THE CHALLENGED FOREST PLAN

50.     The Flathead National Forest approved its Revised Forest Plan on

December 27, 2018.  The Revised Plan replaced the 1986 Flathead Forest Plan and

its amendments, including Amendment 19, and will provide management direction for the Forest for at least the next fifteen years.

51.     Before issuing the Revised Plan, the Forest Service released a Final EIS for the Plan.  The Forest Service also consulted with FWS pursuant to the ESA about the Revised Plan's impacts on grizzly bears and bull trout, which resulted in FWS issuing a Biological Opinion on November 22, 2017.  The Biological Opinion concluded that the Revised Plan's new management direction is not likely to jeopardize grizzly bears and bull trout or adversely modify bull trout critical habitat.

52.     Despite the continued threats facing grizzly bears and bull trout, the Flathead's Revised Plan weakened protections for these species in multiple respects.  The Revised Plan, through a sleight of hand, allowed new roadbuilding throughout much of the Forest, without the stringent reclamation procedures that are necessary to compensate for harm caused by new roads and ensure grizzly bears have an adequate amount of secure habitat.  The Plan also replaced mandatory road and culvert restrictions that formerly protected bull trout habitat with a hortatory guideline that will allow more roads and culverts and thus greater stream sedimentation throughout the Flathead.  Further, the Revised Plan and accompanying Biological Opinion abandoned the former annual culvert monitoring program, replacing it with a requirement that the Service monitor

culverts on a six-year rotating basis—thus increasing the risk that problem culverts will fail and cause harmful stream pollution before the Service can remove them.

### A.    Unlawful Changes to Grizzly Bear Management

53.    First, the Revised Plan eliminated Amendment 19's road density requirements that the Forest Service previously deemed vital to protecting grizzly bear habitat in the Northern Continental Divide Ecosystem.  Instead of carrying forward Amendment 19's requirements, the Revised Forest Plan stated that the Forest Service will maintain "baseline levels … of open motorized route density, total motorized route density, and secure core in the recovery zone/primary conservation area" that existed in 2011.  Final EIS, vol. 2 at 173; Revised Forest Plan at 172 (defining "baseline" as conditions as of December 31, 2011). According to the Service, this new management direction will provide "on-the-ground levels of security for grizzly bears that have supported the NCDE grizzly bear population."  Final EIS, vol. 2 at 173.

54.    At the outset, the 2011 road density baseline is less protective of grizzly bears than the prior Amendment 19 management regime, because the Service never attained the Amendment 19 road density limits in many parts of the Flathead.  Indeed, by the Service's own estimate, the Flathead would need to reclaim an additional 518 miles of roads to meet the Amendment 19 standards, an amount approaching the 730 miles the Forest Service has reclaimed to date.  Thus,

areas of the Forest that have still not met Amendment 19 requirements, such as the Swan Valley, will continue to provide poor grizzly bear habitat security into the foreseeable future.  The Revised Plan also discarded Amendment 19's proscription against high-use non-motorized routes in "security core" grizzly bear habitat, allowing an unlimited number of such routes in formerly secure habitat.

55.    Even worse, however, the Revised Forest Plan's commitment to maintaining even the less-protective 2011 baseline is illusory, because the Revised Plan moved the goal posts on what qualifies as a "reclaimed" road.  Under the Revised Plan, "[d]ecommissioned roads do not count towards total motorized route density as long as they meet the definition of impassable."  Revised Forest Plan at 199.  However, "impassable" roads, as defined by the Plan, are no such thing.  The Forest Service will deem a road "impassable" if "the first 50 to 300 feet … has been treated to make it inaccessible to wheeled motorized vehicles."  Revised Forest Plan at 199.  By the Forest Service's estimation, "natural vegetation growth, … scarified ground, fallen trees, boulders, or culvert or bridge removal" can be sufficient to meet this criterion.  Revised Forest Plan at 199.  Thus, under the Revised Plan, the Forest Service may deem an existing road "decommissioned" (and thus build new roads) as long as the Service puts a minimal barrier across the first 50 feet of the road, such as fallen trees.

56.     As a practical matter, human use is unlikely to dissipate on roads deemed "impassable" under the Revised Forest Plan's lax standards.  First, decommissioning under this standard does not, by its own terms, require steps to prevent use by non-motorized users.  Access by other than wheeled motorized vehicles can also affect grizzly bear habitat security, especially if non-motorized users—including hikers, mountain bikers, and others—gain easy access to areas that were previously remote from human disturbance.

57.     Further, the minimal measures required by the Revised Forest Plan may not prevent motor vehicle trespass on putatively closed roads, as motorized users can easily remove or bypass a minimal physical barrier.  As grizzly bear scientists studying the impacts of road density on bears have asserted, "[u]nless a road has completely revegetated, managers should assume that some level of human use is occurring along closed roads, and grizzly bears will respond to that use."  Mace & Manley 1993, at 25.

58.     By contrast, under Amendment 19, roads in grizzly bear habitat counted against maximum road-density requirements unless the Service fully reclaimed them by, at a minimum, treating the first 200 feet of the road "to preclude its use as a motorized or non-motorized travel way"; revegetating and scattering debris on the remainder of the road; and removing all stream culverts under the road.  Amendment 19 EA, app. D at 2.  Removing stream culverts in

particular effectively eliminates the threat of motor vehicle trespass, because motor

vehicles cannot practically navigate a road after the culverts have been taken out.

59.     By opening the door to new road construction without requiring the

Forest Service to compensate for new construction by fully decommissioning

existing roads, the Revised Forest Plan threatens a severe impact to grizzly bear

habitat security.  As researchers demonstrated more than twenty years ago, even

closed roads threaten a detrimental impact to grizzly bear survival, because grizzly

bears are displaced from roaded habitat, regardless whether the roads are open to

public or administrative use.  The Revised Forest Plan, however, permits the Forest

Service to leave closed roads in place, and in fact contemplates that some of these

roads will be stored in a condition that will allow future use.  See Revised Forest

Plan at 199 ("Impassable roads may remain on the inventoried road system if use

of the road is anticipated at some point in the future.").  Therefore, under the

Revised Forest Plan, roads "reclaimed" by the Forest Service to pave the way for

even more road construction can remain on the landscape indefinitely and displace

grizzly bears from their habitat long after the roads have been "closed."

60.     The Forest Service's Final EIS for the Revised Forest Plan failed to

recognize that the change in the Flathead's road reclamation requirements will

allow the Forest Service to build many more roads in the Flathead without

compensating for that new construction with meaningful reclamation.  To the

contrary, the Final EIS asserted that the Revised Plan will "retain levels of open or total road densities and secure core that have supported grizzly bear recovery on the Flathead National Forest."  Final EIS, vol. 2 at 356 (describing impacts of all project alternatives discussed in the Final EIS).  As a result, the Final EIS also failed to evaluate the extent of the impact this new management direction will have on grizzly bears.  Further, the Final EIS failed to accurately characterize the environmental benefits of the no-action alternative, which would have carried forward Amendment 19's requirements.

61.     The FWS Biological Opinion on the Revised Forest Plan similarly failed to acknowledge the threat of new road proliferation and associated human disturbance of grizzly bear habitat that the Revised Plan allows.  Instead, FWS simply stated that the Revised Plan will not cause jeopardy because it "will require projects to results [sic] in no net increase above baseline conditions in" open motorized route density and total motorized route density.  Flathead Biological Opinion at III-80.

62.     Although the management changes associated with the Forest Service's abandonment of Amendment 19 requirements were overlooked in the Final EIS and the Biological Opinion, their significant consequences for grizzly bear habitat security are already becoming apparent.  For example, under Amendment 19, only 3.2 miles of new roads were built in grizzly bear habitat on

the Flathead National Forest from 1996 to 2010—and even this small amount was apparently offset by similar amounts of road reclamation, resulting in no net increase in total road density.  By contrast, a single Flathead project already proposed to be implemented under the Revised Forest Plan would build 60 miles of new roads, retain them in the road system, and not require that they (or other roads elsewhere in the Flathead) be decommissioned and removed from the road system according to the standards that prevailed under Amendment 19.  Flathead National Forest, Mid-Swan Landscape Restoration and Wildland Urban Interface Project, Scoping Document, at 21 (Oct. 2018).  This will result in a marked reduction in baseline grizzly bear security conditions present in 2011, but those reductions will be masked and ignored due to changes in how baseline conditions are defined and measured under the Revised Forest Plan.

### B. Unlawful Changes to Bull Trout Management

63.    The Revised Plan's abandonment of Amendment 19 requirements likewise threatens harm to bull trout habitat.  As discussed, former Forest Plan Amendment 19 required the Forest Service to reclaim roads through stringent measures to meet road density standards throughout most of the Forest.  One of these reclamation requirements was to remove all stream-aligned culverts from the reclaimed roads, so that orphaned culverts in otherwise closed parts of the road system would not cause sedimentation in streams.  Although Amendment 19's

primary purpose was to protect grizzly bears, the Forest Service also concluded

that the Amendment 19 standards would help to conserve bull trout in the Forest.

Consistent with this conclusion, the 2015 Bull Trout Recovery Plan stated that

minimizing the threat of sedimentation "requires reduction of [road construction

and maintenance] or implementing best management practices" such as

"maintaining bridges, culverts and crossings" and "decommissioning surplus roads

and removing culverts and bridges on closed roads."  Bull Trout Recovery Plan at

26.

     64.    As described above, however, the Revised Forest Plan abandoned

Amendment 19's mandatory road-reclamation requirements, including culvert

removal, thus subjecting bull trout to new threats of erosion and sedimentation

when roads and road culverts remain on the Flathead landscape.

     65.    The Plan's only nod toward addressing the resulting impacts on bull

trout habitat was inclusion of a new guideline, called FW-GDL-CWN-01, which

provides that "net increases in stream crossings and road lengths should be avoided

in riparian management zones unless the net increase improves ecological function

in aquatic ecosystems."  Revised Forest Plan at 18 (emphasis added).  However, as

a Forest Plan "guideline" describing what the Service "should" do, this provision is

not mandatory, both by definition and by its own terms.  See id. at 6 (defining

"guideline").  Further, the new guideline applies only in the so-called

"conservation watershed network," which excludes significant portions of designated critical bull trout habitat, including Swan Lake and the land surrounding it, the headwaters of Cyclone Creek, and portions of the Swan River and Flathead River watersheds.  Compare id., app. B at 2 (map of conservation watershed network) with Flathead National Forest, Biological Assessment for Threatened, Endangered, and Proposed Species, at 332-335 (Oct. 31, 2017) (maps of bull trout critical habitat).  The Revised Plan's geographically limited guideline is therefore less protective than Amendment 19's requirements, which applied in some areas excluded by the conservation watershed network.  Thus, the Revised Plan replaced Amendment 19's mandatory protections with a substitute that is both hortatory and geographically limited.

66.     The Final EIS overlooked this impact as well.  The Final EIS stated that, under the Revised Plan's grizzly bear habitat standards, "there would be no net increase to the baseline open motorized route density or total motorized route density," ignoring the Revised Forest Plan's allowance for new roadbuilding—and new culvert installation—throughout most of the Forest, as long as the Forest Service "reclaims" other roads by placing a minimal barrier across the entrance of those roads.  Final EIS, vol. 1, at 135.  That barrier, of course, will not prevent the unreclaimed roadbed from eroding or culverts under the road from failing and releasing large amounts of sediment into bull trout habitat.  Further, as discussed,

minimal barriers may allow motorized and non-motorized trespass on "impassable" roads, causing further sedimentation.

67.    The Final EIS further stated that, under guideline FW-GDL-CWN-01, "there would be no net increase in the length of roads and stream crossings inside riparian management zones for watersheds within the conservation watershed network."  Final EIS, vol. 1, at 135.  This assertion, however, ignored that the guideline is voluntary, and therefore does not ensure that roads will not increase in riparian areas.  As a result, the Forest Service failed to acknowledge that new roadbeds and culverts could be built in bull trout habitat, and failed to analyze the impacts of that potential new infrastructure on bull trout and their critical habitat.

68.    FWS likewise failed to acknowledge or rationally address the change from a mandatory to a hortatory roadbuilding restriction in its Biological Opinion concerning bull trout.  Indeed, FWS appeared to misunderstand the effect of the Revised Plan guideline described above, stating that the Plan's "direction for the conservation watershed network" does "not allow[] a net increase of road network in these watersheds."  Flathead Biological Opinion at II-48-49 (emphasis added).  Further, despite evidence cited above that the Revised Plan's new management direction will cause harm to bull trout, FWS's Biological Opinion failed to provide an incidental take statement, as required under governing regulations.  See 50 C.F.R. § 402.14(i)(1).

### C.      Unlawful Change to Culvert Monitoring Requirements

69.      The Revised Plan threatens further harm to bull trout by diluting former culvert monitoring requirements, which addressed the threat of stream sedimentation by ensuring that the Forest Service identified and removed problem culverts before they failed.  Under a 2015 programmatic biological opinion governing road maintenance activities throughout western Montana, the Forest Service was required to inspect annually any culverts remaining on closed roads. FWS, Biological Opinion on the Effects to Bull Trout and Bull Trout Critical Habitat from the Implementation of Proposed Actions Associated with Road-related Activities that May Affect Bull Trout and Bull Trout Critical Habitat in Western Montana, at 99 (Apr. 15, 2015) (Appendix E).  Forest Service decisions for five other individual projects on the Forest, including the Chilly James Restoration Project, also provided for annual culvert monitoring in certain parts of the Forest.

70.      The Revised Forest Plan, however, abandoned these former annual monitoring requirements, replacing them with a program under which each culvert would be checked only every six years.  Thus, the Revised Plan's culvert monitoring regime is six times less protective of bull trout than the management requirement that it replaced.

71.     As with the other changes in road management discussed above, the Final EIS and Biological Opinion failed to acknowledge the Revised Plan's change to culvert monitoring requirements, or to examine the effect of this change on bull trout.  To the contrary, the Biological Opinion asserted that this new monitoring requirement would be more protective than the former monitoring program, because it would apply throughout the Forest, rather than in certain project areas only.  This statement ignored the fact that the 2015 programmatic biological opinion cited above applied to, and thus required annual culvert monitoring of, closed roads throughout the Flathead Forest.

72.     In sum, the Forest Service and FWS failed to rationally address the impact of the Revised Forest Plan's more lenient road reclamation requirements on threatened grizzly bears and bull trout in the Forest.  To the contrary, both agencies failed even to acknowledge that the Revised Forest Plan would allow new roadbuilding in the Flathead National Forest and accompanying greater harm to protected species, without effective compensatory reclamation of other roads elsewhere in the Forest.  Further, the agencies failed to consider and analyze the potential impacts of the Revised Plan's less-rigorous culvert monitoring requirements on bull trout and their critical habitat.  The Forest Service and FWS therefore violated governing legal requirements.

## FIRST CAUSE OF ACTION

### (Violation of Endangered Species Act—
### Failure to rationally address threats to grizzly bears)

73.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

74.     Under the ESA, the Forest Service is required to ensure that the actions it takes will not jeopardize the survival of threatened grizzly bears.  16 U.S.C. § 1536(a)(2).  To meet this requirement, the Forest Service must consult with FWS about proposed actions that may adversely affect grizzly bears.  Id.; 50 C.F.R. § 402.14(a).  During such consultation, FWS must rationally determine whether the Forest Service's action will jeopardize grizzly bear survival and recovery, based on a consideration of all relevant factors.  See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1121.

75.     The Forest Service violates the ESA if it approves or implements an action in reliance on a legally flawed biological opinion or fails in its approval or implementation decision "to discuss information that would undercut the [biological] opinion's conclusions."  Ctr. for Biological Diversity v. BLM, 698 F.3d at 1127-28 (citation omitted); accord Save Our Cabinets, 255 F. Supp. 3d at 1063.

76.     The Revised Forest Plan weakened grizzly bear habitat protections by allowing new roadbuilding throughout the Flathead National Forest, without

34

meaningful reclamation of other roads elsewhere in the Forest to compensate for the new road construction.  This new management direction is a significant departure from former Forest Plan Amendment 19, which required the Forest Service to reclaim roads according to stringent requirements such that a reclaimed road would "no longer function as a road."  Amendment 19 EA, app. D at 2.

77.    New roadbuilding in the Forest without meaningful reclamation to ensure no net increase in the road system presents a significant threat to grizzly bears, because motor vehicle users and other recreationists can trespass on the "reclaimed" roads and thus encroach on grizzly bear habitat.  Further, even closed roads threaten a detrimental impact to grizzly bear survival and reproduction, because grizzly bears are displaced from roaded habitat, regardless of whether the roads are open to public or administrative use.  FWS's Biological Opinion on the Revised Forest Plan, however, did not acknowledge or analyze this potential impact to grizzly bears in concluding that the Revised Plan will not jeopardize the species.

78.    FWS thus failed to rationally determine, based on a consideration of all relevant factors, whether the Revised Forest Plan's new management direction will jeopardize the survival of grizzly bears in the Flathead.  See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1121 ("A Biological Opinion is arbitrary and capricious if it fails to 'consider[ ] the relevant factors and articulate[ ] a rational

connection between the facts found and the choice made.'") (citation omitted).

The Forest Service's reliance on FWS's inadequate Biological Opinion in issuing

the Revised Forest Plan was likewise unlawful.  See id. at 1127-28.

79.     The Biological Opinion and the Revised Plan relying on that Opinion

are therefore arbitrary, capricious, and not in accordance with law, and should be

set aside pursuant to the ESA and APA.  16 U.S.C. § 1540(g); 5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION

### (Violation of Endangered Species Act—
### Failure to rationally address threats to bull trout)

80.     All preceding paragraphs are hereby incorporated as if fully set forth

herein.

81.     Under the ESA, the Forest Service is required to ensure that the

actions it takes will not jeopardize the survival of threatened bull trout or adversely

modify their critical habitat.  16 U.S.C. § 1536(a)(2).  To meet this requirement,

the Forest Service must consult with FWS about proposed actions that may

adversely affect bull trout.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  During

such consultation, FWS must rationally determine whether the Forest Service's

action will jeopardize bull trout survival and recovery or adversely modify bull

trout critical habitat, based on a consideration of all relevant factors.  See Ctr. for

Biological Diversity v. BLM, 698 F.3d at 1121.  If FWS finds that the action will

not jeopardize bull trout but will nevertheless result in "take" of the species, FWS

must issue an incidental take statement with its Biological Opinion.  50 C.F.R.

§ 402.14(i)(1).

82.    The Forest Service violates the ESA if it approves or implements an

action in reliance on a legally flawed biological opinion or fails in its approval or

implementation decision "to discuss information that would undercut the

[biological] opinion's conclusions."  Ctr. for Biological Diversity v. BLM, 698

F.3d at 1127-28 (citation omitted); accord Save Our Cabinets, 255 F. Supp. 3d at

1063.

83.    The Revised Forest Plan weakened bull trout habitat protections by

allowing new roadbuilding throughout the Flathead National Forest without

meaningful reclamation of existing roads to compensate for the new road

construction.  This new management direction is a significant departure from

former Forest Plan Amendment 19, which required the Forest Service to reclaim

roads according to stringent requirements such that a reclaimed road would "no

longer function as a road."  Amendment 19 EA, app. D at 2.  Importantly for bull

trout, the Revised Plan does not require the Forest Service to remove culverts from

closed or reclaimed roads.

84.    In lieu of Amendment 19's mandatory roadbuilding restrictions and

reclamation requirements, the Revised Plan set a hortatory guideline to limit

roadbuilding and culvert installation in bull trout habitat.  This hortatory guideline threatens to allow significant new roadbuilding in bull trout habitat.

85.    New roadbuilding without meaningful reclamation to ensure no net increase in the road system threatens stream sedimentation that will degrade critical bull trout habitat.  Surface runoff on roads, including roads closed to public travel, threatens to cause sediment discharge to nearby waterbodies, including bull trout streams.  Culverts in particular inevitably clog and fail, causing the affected stream to run over the roadbed with associated erosion and sedimentation.  Such sedimentation threatens to degrade stream conditions and harm bull trout, which require very cold and clean water to survive and reproduce.

86.    The Revised Plan and accompanying Biological Opinion further discarded a requirement that the Forest Service annually monitor culverts in the Forest.  Instead, the Revised Plan instructs the Forest Service to check each culvert every six years—a measure that is six times less protective than previous management direction.  This new monitoring regime therefore threatens to allow more culverts to fail in the Forest, thus increasing sedimentation and accompanying impacts to bull trout critical habitat.

87.    FWS's Biological Opinion on the Revised Forest Plan did not acknowledge or analyze these potential impacts to bull trout in concluding that the

Revised Plan will not likely jeopardize bull trout or adversely modify bull trout critical habitat.

88.     FWS thus failed to rationally determine, based on a consideration of all relevant factors, whether the Revised Forest Plan's new management direction will jeopardize the survival of bull trout or adversely modify bull trout critical habitat in the Flathead.  See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1121.  Further, despite evidence that the Revised Plan's new management direction will cause harm to bull trout, FWS's Biological Opinion failed to provide an incidental take statement, as required under governing regulations.  See 50 C.F.R. § 402.14(i)(1).  The Forest Service's reliance on FWS's inadequate Biological Opinion in issuing the Revised Forest Plan was likewise unlawful.  See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1127-28.

89.     The challenged Biological Opinion, and the Revised Forest Plan relying on that Opinion, are therefore arbitrary, capricious, and not in accordance with law and should be set aside pursuant to the ESA and APA.  16 U.S.C. § 1540(g); 5 U.S.C. § 706(2).

### THIRD CAUSE OF ACTION

### (Violation of National Environmental Policy Act —
### Failure to rationally address impacts to grizzly bears)

90.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

91.     NEPA requires the Forest Service to disclose and analyze all the environmental impacts of its actions, including promulgation of a new Forest Plan. 42 U.S.C. § 4332(2)(C); see Mont. Wilderness Ass'n, 666 F.3d at 560.  This disclosure must include a rational analysis of alternatives to the agency's proposed action, including a no-action alternative that would maintain the status quo.  42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14.

92.     As discussed, the Revised Forest Plan weakened grizzly bear habitat protections by allowing new roadbuilding throughout the Flathead National Forest without meaningful reclamation of existing roads to compensate for the new road construction.  This new management direction threatens to displace grizzly bears from formerly secure habitat.  The Forest Service's Final EIS, however, failed to acknowledge or analyze this impact to grizzly bears.

93.     The Forest Service thus failed to disclose and analyze all the Revised Forest Plan's environmental impacts, contrary to NEPA requirements.  42 U.S.C. § 4332(2)(C); see Mont. Wilderness Ass'n, 666 F.3d at 560 (agency violated NEPA and APA where it failed to consider relevant environmental impacts of travel plan).  The Forest Service further failed to provide a rational analysis of the Final EIS's no-action alternative—that is, continuing management under Amendment 19.  See 40 C.F.R. § 1502.14.

94.     The Final EIS, and the Revised Forest Plan relying on that EIS, are

therefore arbitrary, capricious, and not in accordance with law and should be set

aside pursuant to the APA.  5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION

### (Violation of National Environmental Policy Act — Failure to rationally address impacts to bull trout)

95.     All preceding paragraphs are hereby incorporated as if fully set forth

herein.

96.     NEPA requires the Forest Service to disclose and analyze all the

environmental impacts of its actions, including promulgation of a new Forest Plan.

42 U.S.C. § 4332(2)(C); see Mont. Wilderness Ass'n, 666 F.3d at 560.  This

disclosure must include a rational analysis of alternatives to the agency's proposed

action, including a no-action alternative that would maintain the status quo.  42

U.S.C. § 4332(2)(C)(iii); 40 C.F.R. § 1502.14.

97.     As discussed, the Revised Forest Plan weakened bull trout habitat

protections by allowing new roadbuilding throughout the Flathead National Forest

without meaningful reclamation of existing roads to compensate for the new road

construction.  In particular, the Revised Forest Plan discarded a former requirement

that culverts be removed from reclaimed roads, as well as a requirement that the

Forest Service inspect culverts on closed roads throughout the Forest annually.

The Revised Plan's new management direction thus threatens to cause harmful

sedimentation in critical bull trout habitat.  The Forest Service's Final EIS, however, failed to acknowledge or analyze this impact to bull trout.

98.     The Forest Service thus failed to disclose and analyze all the Revised Forest Plan's environmental impacts, contrary to NEPA requirements.  42 U.S.C. § 4332(2)(C); see Mont. Wilderness Ass'n, 666 F.3d at 560 (agency violated NEPA and APA where it failed to consider relevant environmental impacts of travel plan).  The Forest Service further failed to provide a rational analysis of the Final EIS's no-action alternative—that is, continuing management under Amendment 19.  See 40 C.F.R. § 1502.14.

99.     The Final EIS, and the Revised Forest Plan relying on that EIS, are therefore arbitrary, capricious, and not in accordance with law and should be set aside pursuant to the APA.  5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that FWS's Biological Opinion on the Revised Forest Plan violates the ESA and APA;

2.     Declare that the Forest Service's Revised Flathead National Forest Plan violates the ESA, NEPA, and the APA;

3.     Declare that the Forest Service's Final EIS violates NEPA and the APA;

4.     Set aside and vacate the challenged provisions of the Revised Plan, the Biological Opinion on the Revised Plan, and the Final EIS;

5.     Reinstate and order compliance with former Forest Plan Amendment 19 and former annual culvert monitoring requirements;

6.     Award Plaintiffs temporary, preliminary, and permanent injunctive relief prohibiting the Forest Service from implementing the challenged provisions of the Revised Plan pending compliance with governing law;

7.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorney fees, associated with this litigation; and

8.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 15th day of April, 2019.

/s/ Joshua R. Purtle
Joshua R. Purtle
Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax
jpurtle@earthjustice.org
tpreso@earthjustice.org

*Counsel for Plaintiffs*