Kelly E. Nokes
(Mont. Bar No. 39465862)
Western Environmental Law Center
208 Paseo del Pueblo Sur, No. 602
Taos, NM 87571
Ph: (575) 613-8051
nokes@westernlaw.org

Susan Jane M. Brown
*admitted pro hac vice*
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
Ph: (503) 680-5513
brown@westernlaw.org

John R. Mellgren
*admitted pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, OR 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Counsel for Plaintiffs WildEarth
Guardians and Western Watersheds
Project*

Marla Fox
*admitted pro hac vice*
P.O. Box 13086
Portland, OR 97213
Ph: (651) 434-7737
mfox@wildearthguardians.org

*Counsel for Plaintiff WildEarth
Guardians*

Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax
tpreso@earthjustice.org

*Counsel for Plaintiffs Swan View
Coalition and Friends of the Wild
Swan*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, *et al.*, <br> Plaintiffs, <br><br> and <br><br> SWAN VIEW COALITION, *et al.*, <br> Consolidated Plaintiffs, | Lead Case No. <br> CV 19-56-M-DWM <br><br> Member Case No. <br> CV 19-60-M-DWM |

vs.

KURTIS STEELE, Forest Supervisor,
FLATHEAD NATIONAL FOREST, *et al.*,
            Defendants,

and

DAVID BERNHARDT, Secretary, U.S.
DEPARTMENT OF THE INTERIOR, *et al.*,
            Consolidated Defendants,

and

MONTANA LOGGING ASSOCIATION,
*et al.*,
            Defendant-Intervenors.

**PLAINTIFFS' JOINT BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

GLOSSARY ........................................................................................... vii

INTRODUCTION ......................................................................................1

FACTUAL BACKGROUND .......................................................................2

LEGAL BACKGROUND .............................................................................2

I.      ESA .............................................................................................2

II.     NEPA ...........................................................................................3

III.    TRAVEL MANAGEMENT RULE ...................................................4

ARGUMENT .............................................................................................5

I.      FEDERAL DEFENDANTS VIOLATED THE ESA ....................................5

        A.     The Fish and Wildlife Service Disregarded Harms to Grizzlies
               and Bull Trout from Abandoning Longstanding Road-
               Reclamation Requirements (Swan View Coalition Claims 1 and
               2; WildEarth Guardians Claim 2, Count 1)...........................................6

               1.     Roads Harm Grizzly Bears and Bull Trout................................6

               2.     Amendment 19's Protective Management Regime ..................10

               3.     The Revised Plan Abandons Vital Habitat Protections ............12

               4.     The Fish and Wildlife Service Violated the ESA by
                      Failing to Consider the Revised Plan's Threat to Grizzly
                      Bears..........................................................................................17

               5.     The Fish and Wildlife Service Violated the ESA by
                      Failing to Consider the Revised Plan's Threats to Bull
                      Trout and Their Critical Habitat ...............................................19

        B.     The Fish and Wildlife Service Failed to Consider Impacts to the
               Entire Grizzly Bear Population (WildEarth Guardians Claim 2,
               Count I)..................................................................................................21

i

C.     The Fish and Wildlife Service Arbitrarily Adopted 2011 Access Conditions (WildEarth Guardians Claim 2, Count I) ........................23

D.     The Fish and Wildlife Service Irrationally Addressed Winter Motorized Travel (WildEarth Guardians Claim 2, Count I)..............25

E.     The Grizzly Bear Incidental Take Statement is Unlawful (WildEarth Guardians Claim 2, Count 1) ...........................................29

     1.     Inadequate Road Density and Secure Core Habitat Surrogate ...................................................................................31

     2.     Inadequate Spatial and Temporal Surrogates ...........................33

     3.     Inadequate Over-Snow Motorized Use Surrogates .................36

F.     The Fish and Wildlife Service Unlawfully Omitted an Incidental Take Statement for Bull Trout (WildEarth Guardians Claim 2, Count I)..................................................................37

G.     The Forest Service Violated the ESA by Relying on the Fish and Wildlife Service's Unlawful Biological Opinion (Swan View Coalition Claims 1 and 2, WildEarth Guardians Claim 2, Count II) .................................................................................38

II.     THE FOREST SERVICE VIOLATED NEPA BY FAILING TO EVALUATE OR DISCLOSE ITS WEAKENING OF ROAD-MANAGEMENT STANDARDS (SWAN VIEW COALITION CLAIMS 3 AND 4) ...............................................................................40

III.     THE FOREST SERVICE UNLAWFULLY INTERPRETED THE TRAVEL MANAGEMENT RULE TO AVOID COMPLIANCE WITH THE MINIMIZATION CRITERIA (WILDEARTH GUARDIANS CLAIM 1, COUNT I) ...........................................42

IV.     THE COURT SHOULD VACATE THE UNLAWFUL AGENCY ACTIONS AND PLAN PROVISIONS .......................................................45

CONCLUSION ................................................................................47

# TABLE OF AUTHORITIES

## FEDERAL CASES

All. for Wild Rockies v. Probert,
    412 F. Supp. 3d 1188 (D. Mont. 2019), appeal dismissed sub nom.
    All. For Wild Rockies v. Benson, 2020 WL 3443468 (9th Cir.
    2020) ........................................................................................................39–40

All. for the Wild Rockies v. U.S. Forest Serv.,
    907 F.3d 1105 (9th Cir. 2018) ...........................................................45

Andrus v. Sierra Club,
    442 U.S. 347 (1979)..............................................................................4

Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.,
    273 F.3d 1229 (9th Cir. 2001) ..........................................30, 32, 34, 35

Bennett v. Spear,
    520 U.S. 154 (1997)............................................................................37

Conner v. Burford,
    848 F.2d 1441 (9th Cir. 1988) ............................................................25

Crow Indian Tribe v. United States,
    2020 WL 3831636 (9th Cir. July 8, 2020) .........................................22

Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,
    698 F.3d 1101 (9th Cir. 2012) .....................................................passim

Ctr. for Biological Diversity v. U.S. Fish and Wildlife Serv.,
    623 F. Supp. 2d 1044 (N.D. Cal. 2009).............................................38

Ctr. for Biological Diversity v. Zinke,
    900 F.3d 1053 (9th Cir. 2018) ..............................................................2

Friends of the Wild Swan v. Kehr,
    321 F. Supp. 3d 1179 (D. Mont. 2019), aff'd, 770 Fed. Appx. 351
    (9th Cir. 2019)....................................................................................11

Helena Hunters & Anglers Ass'n v. Marten,
    2020 WL 3577086 (D. Mont. 2020)...................................................46

Kisor v. Wilkie,
    139 S. Ct. 2400 (2019)...........................................................................43

Lands Council v. Powell,
    395 F.3d 1019 (9th Cir. 2005) ............................................................43

N. Alaska Envtl. Ctr. v. Kempthorne,
    457 F.3d 969 (9th Cir. 2006) ................................................................4

N. Plains Res. Council v. U.S. Army Corps of Eng'rs,
    2020 WL 3638125 (D. Mont. 2020)....................................................46

Nat. Res. Def. Council v. Evans,
    279 F. Supp. 2d 1129 (N.D. Cal. 2003)..............................................38

Nat'l Wildlife Fed'n v. Morton,
    393 F. Supp. 1286 (D.D.C. 1975)...................................................42–43

Native Ecosystems Council v. U.S. Forest Serv.,
    428 F.3d 1233 (9th Cir. 2005) ............................................................41

Or. Nat. Res. Council v. Allen,
    476 F.3d 1031 (9th Cir. 2007) ............................................................36

Organized Vill. of Kake v. U.S. Dept. of Agric.,
    795 F.3d 956 (9th Cir. 2015) (en banc) ..............................................47

Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency,
    806 F.3d 520 (9th Cir. 2015) ..............................................................46

Rock Creek All. v. U.S. Fish and Wildlife Serv.,
    390 F. Supp. 2d 993 (D. Mont. 2005)............................................22–23

San Luis & Delta-Mendota Water Auth. v. Jewell,
    747 F.3d 581 (9th Cir. 2014) ................................................................2

Save Our Cabinets v. U.S. Fish and Wildlife Serv.,
    255 F. Supp. 3d 1035 (D. Mont. 2017).......................................3, 18–19, 22, 39

Sierra Club v. Marsh,
    816 F.2d 1376 (9th Cir. 1987), abrogated on other grounds as
    recognized by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,
    789 F.3d 1075, 1088–89 (9th Cir. 2015) ............................................29

Swan View Coal. v. Barbouletos,
  2008 WL 5682094 (D. Mont. 2008), aff'd, 348 Fed. Appx. 295
  (9th Cir. 2009) ................................................................................. 10, 32, 34

Swan View Coal. v. Barbouletos,
  CV 05-64-M-DWM .......................................................................... 32

Tenn. Valley Auth. v. Hill,
  437 U.S. 153 (1978) .......................................................................... 2

Wild Fish Conservancy v. Salazar,
  628 F.3d 513 (9th Cir. 2010) .......................................................... 28, 33, 35, 37

WildEarth Guardians v. Mont. Snowmobile Ass'n,
  790 F.3d 920 (9th Cir. 2015) .......................................................... 4, 44–45

WildEarth Guardians v. U.S. Bureau of Land Mgmt.,
  2020 WL 2104760 (D. Mont. 2020) ............................................... 40

WildEarth Guardians v. U.S. Fish and Wildlife Serv.,
  342 F. Supp. 3d 1047 (D. Mont. 2018) ......................................... 31, 37

Winter Wildlands All. v. U.S. Forest Serv.,
  2013 WL 1319598 (D. Idaho 2013) ............................................... 43

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C. § 706(2) .................................................................................. 2
  § 706(2)(A) .................................................................... passim

16 U.S.C. § 1532(19) .......................................................................... 8, 29
  § 1536(a)(2) ................................................................... passim
  § 1536(b)(3)(A) .............................................................. 3
  § 1536(b)(4) ................................................................... 29, 30, 37
  § 1536(o)(2) ................................................................... 30

42 U.S.C. § 4332(2) ............................................................................ 4
  § 4332(2)(C) ................................................................... 40

## REGULATIONS AND ADMINISTRATIVE MATERIALS

36 C.F.R. § 212.55(b) ...................................................................44

§ 212.80 .............................................................................44

§ 212.80(a) .........................................................................44

§ 212.81 .............................................................................44

§ 212.81(d) .........................................................................44

§ 261.14 .............................................................................44

40 C.F.R. § 1500.1(a) ...................................................................3

§ 1502.14 ............................................................................4

50 C.F.R. § 402.02 ...........................................................21–22, 28

§ 402.14 .............................................................................3

§ 402.14(i) .........................................................................30

§ 402.14(i)(1)(i) ..................................................................30

§ 402.14(i)(1)(iv) ................................................................35

§ 402.14(i)(3) .....................................................................35

§ 402.14(g)(2)–(4) ..............................................................21

§ 402.14(g)(8) ...............................................................22, 24

37 Fed. Reg. 2,877 (Feb. 8 1972) ...........................................42, 44

40 Fed. Reg. 31,734 (July 28, 1975) .............................................21

42 Fed. Reg. 26,959 (May 24, 1977) ..............................................44

70 Fed. Reg. 68,264 (Nov. 9, 2005)
(codified at 36 C.F.R. pt. 212, 251, 261, and 295) .............................4

73 Fed. Reg. 76,272 (Dec. 16, 2008) ..............................................29

80 Fed. Reg. 4,500 (Jan. 28, 2015)
(codified at 36 C.F.R. §§ 212.80, 212.81) ..................................5, 43

# GLOSSARY[*]

| | |
|---|---|
| APA | Administrative Procedure Act |
| Divide Ecosystem | Northern Continental Divide Ecosystem or "NCDE" |
| Conservation Area | Primary Conservation Area or "PCA" |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System |
| OMRD | Open Motorized Route Density |
| Opinion | Biological Opinion |
| Service | Fish and Wildlife Service |
| Statement | Incidental Take Statement or "ITS" |
| TMRD | Total Motorized Route Density |

<u>Note on Administrative Record Citations</u>

Plaintiffs cite documents from the U.S. Fish and Wildlife Service record with the prefix "USFWS" followed by an underscore and then the Bates page number(s) for the cited material.  Plaintiffs cite documents from the U.S. Forest Service record with the prefix "FS" followed by a hyphen and then the Bates page number(s) for the cited material.

---

[*] This brief is in accord with this Court's order (ECF No. 36) identifying a limited list of acronyms allowed. We provide this glossary for those terms as well as acronyms used in quotes from the record.

## INTRODUCTION

Plaintiffs WildEarth Guardians, <u>et al.</u> and consolidated Plaintiffs Swan View Coalition, <u>et al.</u> challenge Federal Defendants' unlawful actions in connection with the U.S. Forest Service's 2018 revision of the land management plan for northwest Montana's Flathead National Forest (the "Revised Plan").  The 2.4-million-acre Flathead National Forest is a linchpin of the Northern Continental Divide Ecosystem, an area of globally significant wildlands in an increasingly developed world and a stronghold for sensitive and iconic wildlife species.  Yet the Revised Plan abandoned key protections for threatened species and paved the way for harmful new development activities in important wildlife habitats of the Flathead. Federal Defendants' underlying environmental analysis and decision making arbitrarily omitted and truncated consideration of key impacts, overlooked the best available science, relied on unfounded assumptions, authorized take of protected species without adequate safeguards, and ignored requirements for controlling impacts of motorized vehicles.  For these reasons, Federal Defendants' approval of the Revised Plan violated the Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), and the U.S. Forest Service's Travel Management Rule.

## FACTUAL BACKGROUND

The factual background of this case is set forth in the Statement of

Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment.

## LEGAL BACKGROUND

This Court reviews Plaintiffs' claims under the Administrative Procedure

Act ("APA"), 5 U.S.C. § 706(2); see San Luis & Delta-Mendota Water Auth. v.

Jewell, 747 F.3d 581, 601 (9th Cir. 2014).  Under this standard, agency action must

be set aside when it is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  5 U.S.C. § 706(2)(A).  In particular, "[a]n agency

action is arbitrary and capricious if the agency has … entirely failed to consider an

important aspect of the problem."  Ctr. for Biological Diversity v. U.S. Bureau of

Land Mgmt., 698 F.3d 1101, 1109 (9th Cir. 2012) (quotation and citation omitted).

## I.   ESA

"The ESA is 'the most comprehensive legislation for the preservation of

endangered species ever enacted by any nation.' It represents a commitment 'to

halt and reverse the trend toward species extinction, whatever the cost.'" Ctr. for

Biological Diversity v. Zinke, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting Tenn.

Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted).

Under the ESA, before authorizing an action that may affect ESA-listed grizzly

bears, bull trout, or Canada lynx, the Forest Service must formally consult with the

2

U.S. Fish and Wildlife Service to ensure the action is not likely to jeopardize the species or destroy or adversely modify designated critical habitat.  See 16 U.S.C. § 1536(a)(2).  The consultation process culminates in the Fish and Wildlife Service's issuance of a biological opinion reflecting its jeopardy determination based on "the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2), (b)(3)(A); see 50 C.F.R. § 402.14.

The Fish and Wildlife Service violates the ESA if it issues a biological opinion that "fails to 'consider[] the relevant factors and articulate[] a rational connection between the facts found and the choice made.'"  Ctr. for Biological Diversity, 698 F.3d at 1121 (alteration in original) (citation omitted).  In turn, the Forest Service violates the ESA if it approves or implements action in reliance on a flawed biological opinion from the Fish and Wildlife Service and/or fails "to discuss information that would undercut the [biological] opinion's conclusion." Id.; accord Save Our Cabinets v. U.S. Fish and Wildlife Serv., 255 F. Supp. 3d 1035, 1063 (D. Mont. 2017).

## II.    NEPA

NEPA "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA requires all federal agencies proposing an action "significantly affecting the quality of the human environment," to detail "(i) the environmental impact of the proposed action, (ii) any adverse environmental

3

effects which cannot be avoided should the proposal be implemented, [and] (iii)

alternatives to the proposed action."  42 U.S.C. § 4332(2); 40 C.F.R. § 1502.14.

This environmental impact statement ("EIS") helps ensure "that environmental

concerns [will] be integrated into the very process of agency decision-making."

Andrus v. Sierra Club, 442 U.S. 347, 350 (1979).  The Forest Service violates

NEPA if it fails to disclose and take a "hard look" at all expected environmental

impacts of a proposed agency action.  N. Alaska Envtl. Ctr. v. Kempthorne, 457

F.3d 969, 975 (9th Cir. 2006).

## III.    TRAVEL MANAGEMENT RULE

The U.S. Department of Agriculture promulgated its Travel Management

Rule, 70 Fed. Reg. 68,264 (Nov. 9, 2005) (codified at 36 C.F.R. pt. 212, 251, 261,

and 295), to improve implementation of Executive Orders 11644 and 11989

requiring minimization of damage to public lands from off-road vehicles and to

"establish a national system of roads, trails, and areas with restricted [off-road

vehicle] use."  WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920,

929 (9th Cir. 2015); see also ECF No. 51 (Order on Mot. to Dismiss at 2–4).  In

2015, the Forest Service issued the Over-Snow Vehicle Rule, amending Subpart C

of the Travel Management Rule to require national forests that receive enough

snow to designate areas and trails for over-snow vehicle use according to Subpart

4

B of the Travel Management Rule. 80 Fed. Reg. 4,500 (Jan. 28, 2015) (codified at

36 C.F.R. §§ 212.80, 212.81).

## ARGUMENT

The Fish and Wildlife Service violated the ESA by issuing a Biological

Opinion that arbitrarily determined that the Revised Plan for the Flathead would

not likely jeopardize grizzly bears, bull trout, or Canada lynx or harm or destroy

designated critical habitat for the latter two species.  The Forest Service violated

the ESA by relying on the flawed Biological Opinion, and violated NEPA and the

Travel Management Rule by undertaking an inadequate analysis of the Revised

Plan.  Accordingly, this Court should hold unlawful and vacate the Federal

Defendants' challenged environmental analysis documents and the challenged

provisions of the Revised Plan, and reinstate pre-existing environmental

protections that were repealed by the Revised Plan.

## I.   FEDERAL DEFENDANTS VIOLATED THE ESA

In determining the Revised Plan will not jeopardize grizzly bears, bull trout,

or Canada lynx or harm or destroy designated critical habitat for bull trout and

lynx, Federal Defendants violated the ESA in multiple ways.

**A.     The Fish and Wildlife Service Disregarded Harms to Grizzlies and Bull Trout from Abandoning Longstanding Road-Reclamation Requirements (Swan View Coalition Claims 1 and 2; WildEarth Guardians Claim 2, Count 1[1])**

First, the Fish and Wildlife Service's November 2017 Biological Opinion failed to recognize and evaluate the Revised Plan's abandonment of rigorous road-reclamation requirements under former Flathead Forest Plan Amendment 19 that protected and restored grizzly bear habitat and provided important protections to bull trout.  The Service also disregarded the Revised Plan's weakening of culvert-monitoring requirements on closed roads that protected bull trout habitat in the Forest.  By failing to acknowledge and rationally examine the Revised Plan's dramatic overhaul of longstanding road-management requirements and resulting harms to grizzly bears and bull trout, the Service violated the ESA.  See Ctr. for Biological Diversity, 698 F.3d at 1121 (biological opinion must consider relevant factors).

### 1.     Roads Harm Grizzly Bears and Bull Trout

At the heart of Swan View Coalition, et al.'s ESA claims is a fundamental biological principle:  roads harm grizzly bears and bull trout.  Roads and associated human use displace grizzly bears and increase grizzly mortality risk during the

---

[1] In accordance with this Court's order to avoid duplicate briefing, ECF No. 36 at 2, Plaintiffs WildEarth Guardians, et al. join consolidated Plaintiffs Swan View Coalition et al.'s claim for relief as it relates to grizzly bears.

non-denning season.  USFWS_002005 (Biological Opinion).  Displacement occurs because grizzly bears form "negative association[s] with roads aris[ing] from the fear of vehicles, vehicle noise, and other human-related activities around roads," as well as "from human scent along roads and hunting and shooting along or from roads."  USFWS_002029.  As a result, grizzly bears avoid roads, adjusting "their habitat use patterns in part" according to the density of roads in an area.  FS-174734–35.  Crucially, this impact extends to low-use and even closed roads.  Statement of Facts ("SOF") ¶ 25.  Even where "roads [are] closed to public travel," researchers have documented bear "avoidance of high total road densities areas."  FS-182182.  The Fish and Wildlife Service has acknowledged that "[g]rizzly bears … learn to avoid the disturbance generated by roads and may not choose to use these habitats even long after road closures."  USFWS_002029 (Biological Opinion); see also USFWS_030056 (Amendment 19 biological opinion stating that grizzlies "learn to avoid the disturbance and annoyance generated by roads," and "may not change this resultant avoidance behavior for long periods after road closures and lack of negative reinforcement").

Habitat degradation caused by high road density injures individual female grizzly bears "by significantly disrupting normal behavioral patterns, including breeding, feeding, or sheltering."  USFWS_002066 (incidental take statement).  In particular, high road density impairs female grizzly bears' "inherent reproductive

potential," because females "may fail to breed at their potential frequency or they would fail to complete gestation due to decreased fitness." Id. Thus, "if unroaded habitats are reduced in quantity or size, the number of adult females will eventually decline," harming the grizzly bear population. FS-174735. Indeed, the adequacy of grizzly bear habitat is so closely tied to road density that the Fish and Wildlife Service uses road density as a proxy for measuring impacts that constitute "take" of this species. USFWS_002067 (Biological Opinion).[2]

In addition to harming grizzly bears, roads, new road construction, and improper reclamation of closed roads harm bull trout. "[B]ull trout generally have the most specific habitat requirements" of all salmonid species, needing clean, cold water to spawn, develop, and survive. USFWS_014341. Roads contribute sediment into bull trout habitat that impairs reproduction by "reduc[ing] survival of eggs and embryos" and "negatively affecting juveniles and adults by interfering with foraging, clogging gills, physically abrading tissues, and disrupting orientation and movement patterns." USFWS_014377 (Bull Trout Recovery Plan). Sediment can also "lead to changes in channel morphology and water temperature," USFWS_001935 (Biological Opinion), threatening to render an

---

[2] Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species. 16 U.S.C. § 1532(19).

impacted stream uninhabitable by bull trout, which have "extremely low tolerance for warm water temperatures."  USFWS_014377 (Bull Trout Recovery Plan).

Roads deliver sediment to streams "by direct erosion of cut and fill slopes associated with stream crossings or by surface runoff from roads and ditches that carry sediment-laden water directly or indirectly to streams."  USFWS_001935 (Biological Opinion).  "Vehicle traffic also contributes to sediment delivery from roads, particularly if ruts develop in the road and if traffic is heavy when the ground is more saturated."  Id.  Road construction can increase sediment delivery to streams "due to the heavy equipment required for road grading, ditch cleaning, culvert replacement, road ripping/decompaction, and the installation of water bars."  USFWS_001936.

Further, stream-aligned culverts supporting a road can trap debris and ultimately fail, leading the stream to run over the roadbed and thereby causing erosion and sedimentation.  FS-052416.  The Fish and Wildlife Service admits that, "[w]hatever the design life, any crossing structure would have a 100% chance of failure over its installation life if it is not removed after the road is abandoned."  USFWS_030236–37 (Fish and Wildlife Service, biological opinion on Moose Post-Fire Project (2002)) (emphasis added).  Accordingly, as the Fish and Wildlife Service acknowledges, "[t]he potential for roads to have detrimental effects on aquatic resources exists as long as the road is retained."  USFWS_001936

(Biological Opinion); see USFWS_014377 (2015 Bull Trout Recovery Plan) (reducing the threat of sedimentation requires "maintaining bridges, culverts, and crossings" and "decommissioning surplus roads and removing culverts and bridges on closed roads"); see SOF ¶ 52 (describing benefits of road decommissioning).

2.   Amendment 19's Protective Management Regime

Spurred to address these threats by pioneering scientific research and a public conservation campaign, the Forest Service in 1995 issued Amendment 19 to the 1986 Flathead Forest management plan.  SOF ¶ 54.  Amendment 19 set limitations on road density within grizzly bear habitat.  SOF ¶ 55.  To ensure that road-density calculations reflected on-the-ground conditions, Amendment 19 required the Forest Service to reclaim and render inaccessible to motor vehicles any road it excluded from road-density calculations.  FS-178392.  To "reclaim" a road, Amendment 19 required the Forest Service to—at a minimum—treat the first portion of the road, typically 200 to 600 feet, "to preclude its use as a motorized or non-motorized travel way"; revegetate and scatter natural debris on the remainder of the road; and remove all stream-aligned culverts under the road.  FS-178392.  Such treatment was intended to make the "reclaimed road no longer function as a road or trail."  Id.; see also Swan View Coal. v. Barbouletos, 2008 WL 5682094, at *3 (D. Mont. 2008) (describing Amendment 19 requirements), aff'd, 348 Fed. Appx. 295 (9th Cir. 2009).  While the Forest Service adopted these measures to

10

protect grizzly bear habitat, the agency has acknowledged that Amendment 19 standards also help to conserve bull trout.  USFWS_001627 (Biological Assessment).

When the Forest Service issued Amendment 19, much of the Flathead Forest did not comply with the Amendment's road-density limitations.  Thus, under Amendment 19, the Forest Service decommissioned and removed from its road system about 730 miles of Flathead roads since 1995.  FS-052856.  However, the Forest Service still needed to reclaim an addition 518 miles of roads to meet Amendment 19 standards at the time the agency revised the Flathead plan in 2018. FS-052880.[3]

In addition to requiring removal of hundreds of miles of roads, Amendment 19 had the practical impact of discouraging new roadbuilding in grizzly habitat through its rigorous reclamation requirements.  Because road densities on the Flathead exceeded Amendment 19 standards, the amendment prevented the Forest Service from constructing new roads in grizzly bear habitat until it had expended time and resources to reclaim comparable miles of roads elsewhere.  FS-042259

---

[3] Under the National Forest Management Act, "[e]ach project within a national forest must be consistent within the governing forest plan."  Friends of the Wild Swan v. Kehr, 321 F. Supp. 3d 1179, 1193 (D. Mont. 2019), aff'd, 770 Fed. Appx. 351 (9th Cir. 2019).  Accordingly, NFMA required each Flathead Forest project to comply with Amendment 19's road-density standards.

(Amendment 19 decision notice requiring that "Forest Service actions will result in a net gain towards the objectives on National Forest System lands").  As a result, under Amendment 19, the Forest Service constructed only 3.2 miles of new roads in Flathead grizzly habitat between 1996 and 2010.  FS-171069 (Forest Service report on Amendment 19 compliance).

### 3.    The Revised Plan Abandons Vital Habitat Protections

The Revised Plan challenged in this case eliminated Amendment 19's vital habitat protections.  The Revised Plan abandoned Amendment 19's road-density requirements, stating that the Forest Service will instead maintain "baseline" road-density levels that existed in grizzly bear habitat in 2011, during the period when Amendment 19 was in effect.  FS-052886 (Final EIS); FS-052052 (Revised Plan defining "baseline" as conditions as of December 31, 2011).  The agency claimed this new management direction will provide "on-the-ground levels of security for grizzly bears that have supported the NCDE grizzly bear population."  FS-052886 (Final EIS).

At the outset, however, this new regime is less protective of grizzly bears than Amendment 19 because it discards any need to address the remaining 518 miles of roads requiring reclamation to meet Amendment 19 standards.  Further, the Revised Plan's commitment to maintaining even the less-protective 2011 baseline is illusory, because the Revised Plan moved the goal posts on what

qualifies as a "reclaimed" road in the Flathead Forest.  Under the Revised Plan,

"[d]ecommissioned roads do not count towards total motorized route density as

long as they meet the definition of impassable."  FS-052079.  However, the Forest

Service will deem a road "impassable" under the Revised Plan if only "the first 50

to 300 feet … has been treated to make it inaccessible to wheeled motorized

vehicles."  Id.  The Revised Plan provides that "natural vegetation growth, …

scarified ground, fallen trees, boulders, or culvert or bridge removal" can be

sufficient to meet this criterion.  Id.  The Plan contains no requirement to

revegetate or scatter debris on the remainder of the road or to remove stream-

aligned culverts, as Amendment 19 did.  See id.  Thus, under the Revised Plan, the

Forest Service may deem an existing road "decommissioned" (and thus not count

toward road-density standards that limit new road construction) as long as the

Service puts a minimal barrier, such as boulders or fallen trees, across the first 50

feet of the road, and no more is required.  See id.

Motorized vehicles in the Forest's grizzly habitat regularly bypass the same

minimal barriers that the Revised Plan now deems sufficient to render roads

"impassable."  In 2004, Plaintiff Swan View Coalition informed the Forest Service

that it had inspected 256 road closures in grizzly bear habitat, finding that 160

"displayed evidence of motorized travel over, through, or around the closure."  FS-

065788.  Of those ineffective closures, 73 involved "permanent barriers"—such as

13

the boulder barriers endorsed by the Revised Plan—that had been vandalized, circumvented, or were otherwise inadequate.  Id.  In 2015, the Forest Service itself released a memorandum concluding that 19 inspected road-closure devices in Swan Valley-area grizzly habitat—including "gates, earth berms, tank traps, jersey barriers [and] rocks," FS-172631—"were found to be ineffective."  FS-172632. By contrast, Amendment 19's revegetation and culvert-removal requirements— abandoned by the Revised Plan—typically eliminated the threat of motor-vehicle trespass that disturbs and displaces grizzly bears because motor vehicles cannot practically navigate a revegetated road with no culverts.  See FS-065788 (2004 survey of Flathead road reclamation finding "100% effectiveness" for roads closed by "[c]reeks without bridges" and complete revegetation "by trees and brush").

In addition to being ineffective, the Revised Plan's introduction of minimal barriers to replace Amendment 19's stringent reclamation standards facilitates new road construction in grizzly habitat.  Because of the limited time and resources required to reclaim roads under the Revised Plan, the Forest Service may now more easily declare a road "impassable" and thereby facilitate construction of new roads in grizzly habitat while claiming compliance with road-density limits.  At the same time, because the Revised Plan reduces the effectiveness of road closures, new roadbuilding will increase actual, on-the-ground road densities in grizzly bear

habitat—a change that the Forest Service will not capture in road-density calculations under the Revised Plan.

The Revised Plan's abandonment of Amendment 19's reclamation requirements also harms bull trout.  In particular, eliminating the culvert-removal requirement harms bull trout because removing orphaned culverts from reclaimed roads under Amendment 19 precluded culvert-driven sedimentation impacts to bull trout streams.  <u>See</u> FS-017013 (2015 bull trout recovery plan) ("sediment impacts from roads can be addressed by … decommissioning surplus roads and removing culverts and bridges on closed roads.").  In place of mandatory culvert removal, the Revised Plan purported to address impacts to bull trout by including a new guideline ("FW-GDL-CWN-01") providing that "net increases in stream crossings and road lengths <u>should</u> be avoided in riparian management zones unless the net increase improves ecological function in aquatic ecosystems."  FS-051898 (emphasis added).  However, as a "guideline" describing what the Service "should" do, this provision is not mandatory.  <u>See</u> FS-051886 (defining "guideline").  Further, it applies only in a "conservation watershed network" that excludes significant portions of designated bull trout critical habitat, including

Swan Lake and surrounding lands, the Cyclone Creek headwaters, and portions of the Swan River and Flathead River watersheds.  SOF ¶ 96.[4]

In addition to this consequence of eliminating Amendment 19, the Revised Plan compounded its impact to bull trout by undermining culvert-monitoring requirements, which address stream-sedimentation threats by identifying and removing problem culverts before they fail.  A 2015 programmatic biological opinion governing national forest road maintenance activities throughout western Montana required the Forest Service to inspect annually all culverts remaining in bull trout streams on roads closed by a gate or "guardrail, concrete, earth barrier, or recontour at intersection."  FS-174280 (2015 biological opinion); see also SOF ¶ 60.  The 2015 biological opinion does not apply such culvert-monitoring requirements to roads closed by more permanent closure devices, such as boulder barriers, only because it expected that, for all such closures, "all stream crossing structures would be removed at the time of closure."  FS-174280–81.  Thus, the 2015 biological opinion contemplated annual monitoring of all stream-aligned culverts remaining on closed roads in bull trout streams.  See id.

---

[4] Similarly, the Revised Plan included a vague and non-mandatory guideline ("FW-GDL-IFS-04") stating that impassable or stored roads "should be left in a hydrologically stable condition," but not calling for culvert removal.  FS-051947 (emphasis added).

The Revised Plan created a new loophole in this monitoring framework. The Revised Plan weakened road-closure requirements such that the Forest Service no longer must pair permanent closure devices with culvert removal.  FS-052079.  The Revised Plan thus creates a new class of roads not contemplated by the 2015 biological opinion: "impassable" roads closed by a permanent device— such as boulder barriers—upon which stream-aligned culverts may remain.  At the same time, the Revised Plan provides for monitoring of culverts remaining on roads closed by such permanent devices only once every six years—not annually. SOF ¶ 98–99.  Thus, by altering the management foundation on which the requirements of the 2015 biological opinion were based, the Revised Plan established a weaker culvert-monitoring program that threatens to allow more culverts to fail on the Flathead, with associated impacts to bull trout.

        4.     <u>The Fish and Wildlife Service Violated the ESA by Failing to Consider the Revised Plan's Threat to Grizzly Bears</u>

Despite recognizing in its November 2017 Biological Opinion that managing roads in grizzly bear habitat is "one of the most important variables in grizzly bear habitat conservation," USFWS_002028, the Fish and Wildlife Service failed entirely to consider the Revised Plan's abandonment of Amendment 19's stringent road-reclamation standards when evaluating the Plan's adverse impacts to grizzly bears.

As discussed, the Revised Plan's weakened road-density standards represent a sharp departure from Amendment 19's longstanding protections, which required the Forest Service to reclaim roads according to rigorous standards such that a reclaimed road would "no longer function as a road or trail."  FS-178393. (Amendment 19 EA).  By institutionalizing relatively quick and cheap—and often-ineffective—road closures, the Revised Plan allows the Forest Service to increase actual, on-the-ground road densities in grizzly bear habitat while claiming to maintain a 2011 road-density baseline, thereby harming grizzly bears.

The Fish and Wildlife Service failed entirely to acknowledge or evaluate this threat in concluding that the Revised Plan will not jeopardize grizzlies, instead simply stating in its Biological Opinion that the Revised Plan will not cause jeopardy because it "will require projects to result[] in no net increase above baseline [road-density] conditions" that existed in 2011.  USFWS_001937–38 (Biological Opinion); see also FS-052052 (Revised Plan) (defining "baseline" as "conditions as of December 31, 2011").  In so concluding, the Fish and Wildlife Service did not consider that the Revised Plan eliminated Amendment 19 mandates that imposed demanding reclamation standards that both ensured the integrity of road closures and created a substantial disincentive for new road construction in grizzly habitat.  Because the Fish and Wildlife Service "failed to consider an important aspect of the problem," it violated the ESA.  Save Our Cabinets, 255 F.

Supp. 3d at 1063 (holding Service violated ESA by failing to consider "potential

inadequacy" of measures relied upon to prevent impacts to grizzly bears); Ctr. for

Biological Diversity, 698 F.3d at 1121.

> 5.    The Fish and Wildlife Service Violated the ESA by Failing to
> Consider the Revised Plan's Threats to Bull Trout and Their
> Critical Habitat

The Fish and Wildlife Service further violated the ESA by failing to

consider the Revised Plan's abandonment and modification of important

requirements that protected bull trout.  The Revised Plan eliminated Amendment

19 road-reclamation standards that included a culvert-removal requirement,

thereby subjecting bull trout to new threats of erosion and sedimentation impacts.

The Revised Plan replaced this protective framework with a hortatory guideline

that is more geographically limited than the regime it replaced.  The Revised Plan

also allowed culverts to remain in certain classes of closed roads with a

commitment to check their integrity only once every six years, thereby increasing

the threat of culvert failure.

Nevertheless, the Fish and Wildlife Service did not evaluate these impacts.

Despite previously acknowledging that a stream-aligned culvert, if not removed

from a closed road, "would have a 100% chance of failure over its installation

life," USFWS_030236–37, the Service failed to assess the consequences of these

management changes for bull trout or their critical habitat.  Instead, the agency's

Biological Opinion obfuscated these consequences by asserting that the Revised Plan does "not allow[] a net increase of road network" within bull trout watersheds, USFWS_001937–38 (emphasis added)—even though such increases are governed by a guideline, FW-GDL-CWN-01, which is expressly phrased in terms of what the Forest Service "should" do and is, by definition, non-binding. FS-051886 (defining "guideline"); FS-051898 (defining "FW-GDL-CWN-01"). As for the fact that the cited guideline has a narrower geographic scope than the regime it replaced, the Service entirely ignored this point.  SOF ¶ 96.

Regarding the Revised Plan's new loophole in the management framework for annual culvert monitoring, the Fish and Wildlife Service failed to recognize or consider the more protective annual monitoring requirements stated in the 2015 biological opinion that previously governed such culvert monitoring in bull trout habitat.  See USFWS_001960–62.

In sum, the Fish and Wildlife Service's consideration of the Revised Plan's impacts on bull trout was undermined by key errors and omissions, rendering the agency's ultimate conclusion that the Revised Plan would not jeopardize bull trout or harm or destroy their critical habitat both unreliable and unlawful.  For this reason too, the Fish and Wildlife Service violated the ESA.

**B.**     **The Fish and Wildlife Service Failed to Consider Impacts to the Entire Grizzly Bear Population (WildEarth Guardians Claim 2, Count I)**

In making its jeopardy determination, the Fish and Wildlife Service improperly failed to analyze the impacts of the Revised Plan on the listed entity — grizzly bears in the Lower 48—and instead narrowly limited its analysis to the Northern Continental Divide Ecosystem population alone.  See e.g., USFWS_002045 ("we also expect to maintain recovery of the NCDE grizzly bear population" (emphasis added)); USFWS_002057 ("management of NFS lands in accordance with the proposed Revised Plan will support a sustainable and increasing NCDE grizzly bear population" (emphasis added)); USFWS_002059 ("the proposed action will not appreciably reduce the likelihood of both the survival and recovery of the NCDE grizzly bears." (emphasis added)).  The Divide Ecosystem population is only one part of the listed species.  See 40 Fed. Reg. 31,734 (July 28, 1975) (listing the grizzly bear of the 48 coterminous states as threatened).  Failing to consider how weakened habitat protections for grizzly bears in the Revised Plan may negatively impact the survival and recovery of grizzly bears as a whole ignored a relevant and legally required factor.  50 C.F.R. §§ 402.02 (defining "biological opinion"); 402.14(g)(2)–(4) (requiring the Service consider the listed species' current status, and effects of the action and cumulative effects on the listed species).

It also ignored best available science. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §

402.14(g)(8).  The Fish and Wildlife Service acknowledged that the Divide

Ecosystem grizzly population is a major contributor to the total grizzly population,

acting as a source for long-term genetic diversity that is essential to the survival

and recovery of the species as a whole.  SOF ¶ 21; see also Crow Indian Tribe v.

United States, 2020 WL 3831636 (9th Cir. July 8, 2020) (affirming district court

holding that rule delisting the Greater Yellowstone Ecosystem grizzly bear

population unlawfully concluded genetic health no longer poses threat to grizzlies).

But the Fish and Wildlife Service never analyzed whether the Revised Plan,

including the more lenient plan components for roads, may impact the Divide

Ecosystem's ability to act as a source for long-term genetic diversity—in particular

for the Greater Yellowstone or Bitterroot Ecosystems.  USFWS_001992.  The

Service failed to consider whether the Revised Plan will "reduce appreciably the

likelihood of both the survival and recovery" of grizzly bears, the listed species.

50 C.F.R. § 402.02 (defining "jeopardize the continued existence").

The ESA does not allow the Service to analyze the local population in a

vacuum.  Save Our Cabinets, 255 F. Supp. 3d 1050–51 (holding agency's no-

jeopardy conclusion arbitrary where it acknowledged the importance of local

population but failed to adequately consider effect of localized loss on recovery of

larger core population); Rock Creek All. v. U.S. Fish and Wildlife Serv., 390 F.

22

Supp. 2d 993, 1010 (D. Mont. 2005) (holding analysis flawed for failing to consider current status of species "across its entire range").  Because the Fish and Wildlife Service failed to consider the Revised Plan's effects on the survival and recovery of grizzly bears as a whole, it failed to consider the best available science and relevant factors, rendering the jeopardy determination unlawful under the ESA and arbitrary and capricious.  5 U.S.C. § 706(2)(A).

## C.   The Fish and Wildlife Service Arbitrarily Adopted 2011 Access Conditions (WildEarth Guardians Claim 2, Count I)

The Fish and Wildlife Service arbitrarily adopted 2011 access conditions as a target to protect grizzly bears.  SOF ¶ 83–86.  The Revised Plan abandoned Amendment 19's route-density and secure-core requirements and replaced them with access conditions as of December 31, 2011.  USFWS_002040.  As justification, the Fish and Wildlife Service stated the Divide Ecosystem population was increasing in size and distribution in 2011.  USFWS_002040–41.  This reasoning is flawed because it conflicts with best available science, lacks a rational explanation, and ignores relevant factors.

The Fish and Wildlife Service acknowledged that Amendment 19 reflects best available science.  USFWS_002067 ("Based on the best available research and information, we anticipate that some level of incidental take of female grizzly bears will occur" beyond Amendment 19 standards).  Implementation of Amendment 19 since 1995 improved habitat conditions to support an increasing

grizzly bear population on the Flathead.  USFWS_001882.  Despite these

advancements, the Flathead has yet to achieve the goals set out in Amendment 19,

and certainly had not achieved them as of 2011.  USFWS_002059–60 (conceding

32 subunits do not meet Amendment 19 standards, and adverse effects in these

areas will continue).  Setting aside a standard supported by best available science

in favor of a standard with no basis in science violates the ESA.  16 U.S.C. §

1536(a)(2); 50 C.F.R. § 402.14(g)(8).

The Fish and Wildlife Service did not rationally explain how it reached a no-

jeopardy determination for grizzly bears, despite abandoning Amendment 19.  See

USFWS_002041 (stating it does not expect reliance on 2011 access conditions "to

preclude recovery of the [Divide Ecosystem] grizzly bear population.").  The

agency cited no studies to support its conclusion that 2011 access conditions are

sufficient for the grizzly bear's future survival and recovery.  Forsaking attempts to

achieve Amendment 19's goals in favor of reverting to 2011 access conditions

abandoned the safeguards that allowed the Divide Ecosystem grizzly bears to begin

recovering, and that are still necessary to recover the species as a whole.

The Service's reasoning assumed that because the grizzly bear population

was increasing in size and distribution in 2011, those access conditions will be

sufficient for the future survival and recovery of grizzly bears.  This assumption

ignored changed conditions since 2011, such as dispersal of the growing Divide

Ecosystem population beyond the primary conservation area, USFWS_002002, and increased risk of human-caused mortality as a result, USFWS_002021.  <u>See also</u> USFWS_002001 ("human-caused mortality is the most significant factor influencing [Divide Ecosystem] bears").  It ignored how climate change may alter suitable foraging habitat for bears.  USFWS_002013.  And it failed to consider how weakened protections under the 2011 access conditions may hamper the Divide Ecosystem's ability to serve as a source for genetic diversity, necessary for long-term conservation of the species as a whole.  USFWS_001992.  The Fish and Wildlife Service's failure to consider such important aspects of the problem renders the no-jeopardy determination arbitrary and capricious.  <u>Ctr. for Biological Diversity</u>, 698 F.3d at 1121; 5 U.S.C. § 706(2)(A).

### D.     The Fish and Wildlife Service Irrationally Addressed Winter Motorized Travel (WildEarth Guardians Claim 2, Count I)

The Fish and Wildlife Service's no-jeopardy determinations for grizzly bears and Canada lynx violate the ESA because the agency relied on a description of the proposed action that omitted winter motorized travel designations, despite those designations being a part of the agency action.  <u>Conner v. Burford</u>, 848 F.2d 1441, 1458 (9th Cir. 1988) (holding biological opinion that is not "coextensive" in scope with agency action is unlawful).  The Forest Service adopted site-specific winter motorized designations in the Revised Plan.  <u>See, e.g.</u>, FS-052310 ("designated routes and play areas … are retained"); (Doc. 51 at 2–4) (explaining Subpart C of

the Travel Management Rule).  The following map shows "[m]otorized over-snow

vehicle <u>designated</u> late season areas and routes" under the Revised Plan, FS-

052125 (emphasis added):

Flathead National Forest        Figure B-12. Motorized over-snow vehicle designated late season areas and routes in the grizzly bear primary conservation area        Forest Plan



12

Best available science shows the winter motorized designations directly impact grizzly bears, Canada lynx, and lynx critical habitat.  USFWS_002216–17 (mapping modeled grizzly bear denning habitat and designated late-season over-snow routes and areas); USFWS_002227 (Figure 30, "[Lynx Analysis Units] with over-snow motorized use under the Revised Forest Plan"); SOF ¶¶ 30–32, 38, 120 (documenting science showing impacts to wildlife from over-snow vehicles).  The Fish and Wildlife Service acknowledged as much by identifying late-season over-snow motorized use as an exception to the programmatic plan that required an incidental take statement.  USFWS_002065–70.  Still, the Service emphasized the Revised Plan as programmatic and did not mention site-specific winter motorized designations.  See, e.g., USFWS_001868 (explaining plan is "strategic and programmatic and does not provide project-level decisions").  Such omission of relevant factors means the agency never evaluated the Revised Plan's full impact. Wild Fish Conservancy v. Salazar, 628 F.3d 513, 522 (9th Cir. 2010) ("delineation of the scope of an action can have a determinative effect on the ability . . . to describe the impact of the action" on listed species).

The opinion also should have evaluated winter motorized designations as an interrelated action.  50 C.F.R. § 402.02 (2016) (defining "[i]nterrelated actions" as "part of a larger action and depend[ing] on the larger action for their justification.").  The Fish and Wildlife Service acknowledged Amendment 24 as

28

the basis for the Flathead's over-snow vehicle use map incorporated into the 1986 forest plan.  USFWS_002022; USFWS_00214–25.  Because the Revised Plan replaced Amendment 24 "in its entirety," USFWS_001883, the over-snow vehicle designations would not remain in effect "but for" adoption in the Revised Plan, and are thus interrelated.  Sierra Club v. Marsh, 816 F.2d 1376, 1387 (9th Cir. 1987) ("but for" causation is test for interrelatedness), abrogated on other grounds as recognized by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1088–89 (9th Cir. 2015); 73 Fed. Reg. 76,272, 76,277 (Dec. 16, 2008); see also FS-052310 ("designated routes and play areas . . . are retained").  Because the opinion did not evaluate effects from site-specific winter motorized designations, it failed to "insure" the Revised Plan will not jeopardize the continued existence of protected species, is arbitrary, and should be set aside. 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2)(A).

**E.    The Grizzly Bear Incidental Take Statement is Unlawful (WildEarth Guardians Claim 2, Count 1)**

When the Fish and Wildlife Service concludes an action will not jeopardize a listed species, but that it may incidentally "take" members of a listed species, it provides an incidental take statement.  16 U.S.C. § 1532(19) (defining "take"); 16 U.S.C. § 1536(b)(4).  The statement must specify the amount or extent of anticipated take, identify "reasonable and prudent measures" to minimize the takings, and set "terms and conditions" to implement these measures (including

reporting requirements).  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  Take that

complies with the terms and conditions of the statement is not prohibited.  16

U.S.C. § 1536(o)(2).

The Service may use a surrogate to express the anticipated incidental take so

long as the agency describes the causal link between the surrogate and take of the

species, explains why a numeric value is impractical, and "sets a clear standard for

determining when the level of anticipated take has been exceeded."  50 C.F.R. §

402.14(i)(1)(i); Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv., 273

F.3d 1229, 1250–51 (9th Cir. 2001).

Here, the Fish and Wildlife Service determined that two actions under the

Revised Plan may result in incidental take of grizzly bears: motorized access route

densities and over-snow motorized use.  USFWS_002065.  The agency concluded

that take of grizzly bears is likely to occur in the form of: (1) harassment of adult

female grizzly bears in highly roaded areas through displacement, and (2) harm to

adult female bears through significant habitat modification or degradation caused

by high open or total road densities.  USFWS_002065–66.  The Service identified

four surrogates to determine when the level of anticipated take has been exceeded

for motorized access, two of which are inadequate.  The agency also concluded

that over-snow motorized use may cause take of grizzly bears by harassment of

female bears or cubs caused by premature displacement from den sites.

USFWS_002068.  The agency identified two surrogates for over-snow motorized use, both of which are inadequate.

1.    Inadequate Road Density and Secure Core Habitat Surrogate

The statement provides: "Project[s] resulting in changes to OMRD, TMRD, or secure core beyond those permitted by the Revised Forest Plan and analyzed in this biological opinion will result in levels of take that exceed the amount of incidental take we anticipate here, and reinitiation or project-specific consultation would be required."  USFWS_002067.  This surrogate is illegal for three reasons.

First, the trigger is impermissibly ambiguous because it is susceptible to multiple interpretations.  The statement never clearly identifies what kinds of "changes" are "permitted by" the Revised Plan.  The plan components set out numerous exceptions, none of which are clearly defined.  FS-051944–46 (FW-STD-IFS-01 allows administrative use, FW-STD-IFS-02 lists exceptions, FW-STD-IFS-03 allows temporary changes, FW-STD-IFS-04 allows temporary public motorized use).  For example, the plan does not define a "temporary change" to road density or secure core allowed by the plan.  FS-051945 (FW-STD-IFS-03).  Nor does it distinguish a "temporary change" from a "change" that might otherwise trigger reinitiation.  The "inherent infirmity" of the surrogate "fails to set an adequate trigger for take."  WildEarth Guardians v. U.S. Fish and Wildlife Serv., 342 F. Supp. 3d 1047, 1063 (D. Mont. 2018).

31

Second, the surrogate lacks an adequate trigger because the plan does not

impose a deadline to return to 2011 access conditions despite the plan authorizing

"temporary changes."  FS-051945–46 (FW-STD-IFS-03, allowing indefinite,

incremental increases to baseline); FS-052052 ("baseline will be updated to reflect

changes allowed under the standards and guidelines").  The Fish and Wildlife

Service's reliance on a guideline lacks the necessary assurances.  See

USFWS_002043 (FW-GDL-IFS-02); USFWS_001874 (defining guideline as

flexible); USFWS_002044 (acknowledging plan "does not contain grizzly bear

standards that require road closures").  This is a major departure from what this

Court previously upheld.  See Swan View Coal. v. Barbouletos, CV 05-64-M-

DWM, Doc. No. 115 at 37–38 (upholding Amendment 19 take statement that

included deadlines to attain benchmarks) (D. Mont. 2008) (attached as Exhibit);

Swan View Coalition, 2008 WL 5682094, at *22–23 (relying on same).  Allowing

road-density and secure-core values to indefinitely increase conflicts with best

available science showing harm to grizzly bears beyond the Amendment 19

standards.  And it renders the baseline a moving target, undermining any illusion of

a clear standard.  Ariz. Cattle Growers', 273 F.3d at 1251.

Third, the Fish and Wildlife Service's conclusion that the Revised Plan will

maintain 2011 access conditions is not rationally linked to any requirement to do

so in the plan.  Compare USFWS_002040 (concluding FW-STD-IFS-02 would

32

maintain on-the-ground conditions) <u>with</u> USFWS_002044 (plan "does not contain grizzly bear standards that require road closures").  The Service relied on maintenance of 2011 conditions to conclude that the Revised Plan will not preclude recovery. USFWS_002041.  But nothing in the plan ensures maintenance of 2011 access conditions. FS-051945–46.  Rather, the Revised Plan allows indefinite temporary changes to the baseline, in addition to numerous exceptions.  Because the Revised Plan actually allows for access conditions to worsen beyond what existed in 2011, the Service failed to "articulate[] a rational connection between the facts found and the conclusions made."  <u>Salazar</u>, 628 F.3d at 525 (citations omitted).

2.   <u>Inadequate Spatial and Temporal Surrogates</u>

The Service also used inadequate spatial and temporal surrogates: "If on-the-ground implementation of a project exceeds five years, or if a project concurrently impacts OMRD, TMRD, or secure core in more than three adjacent subunits, the level of take exempted under this biological opinion would be exceeded and reinitiation or project-specific consultation would be required (as appropriate)." USFWS_002067–68.  These surrogates are invalid for three reasons.

First, the surrogate is impermissibly ambiguous because nothing in the opinion defines "on-the ground implementation of a project," and the Revised Plan lacks clarity.  <u>See, e.g.</u>, FS-052051–90 (no definition in glossary).  It may include

33

only the logging itself, preparatory road maintenance, or a temporary road remaining after logging.  Whether five years is really a limit is also ambiguous, since it is based on a discretionary guideline.  FS-051946 (FW-GDL-IFS-01); FS-051886 (compliance with guidelines is not mandatory); FS-051947 (allowing exceptions "where necessary").  Yet the Service relies on this guideline as if it were compulsory.

Similarly, what the Fish and Wildlife Service means by a project that "concurrently impacts OMRD, TMRD, or secure core in more than three adjacent subunits" is also ambiguous.  USFWS_002067–68.  The word "impact" may mean <u>any</u> change in the values, or it may refer to only "net change" as set forth in FW-STD-IFS-02.  <u>See</u> FS-051945, FS-052072 (defining "net change").  The term "concurrently" is likewise vague because it is unclear which part of the conjunctive sentence the term is meant to qualify: the three values ("OMRD, TMRD, or secure core") being impacted at one time, impacts to any one of the values occurring simultaneously in adjacent subunits, or both.  Because the trigger is susceptible to multiple interpretations, it fails to set a "clear standard" for take.  <u>Ariz. Cattle Growers'</u>, 273 F.3d at 1250–51.

Second, the Fish and Wildlife Service failed to provide "any supporting study or other evidence of a scientific link" between the five-year limit on projects or three adjacent subunits.  <u>Swan View Coalition</u>, 2008 WL 5682094, at *23.

Instead, the five-year limit is based on a guideline.  USFWS_002067 ("The proposed action indicates that on-the-ground implementation of each project will not exceed five years" and "[t]herefore, we use a maximum of five years … as a surrogate for take.").  The surrogate to not concurrently impact access conditions in more than three adjacent grizzly bear subunits is based on the Service's premise that the surrogate "will provide grizzly bears within a project subunit the opportunity to move away from activities into undisturbed subunits." USFWS_002067.  But displacement is the harm at issue, and cannot be minimized by relying on displacement of bears to other locations.  Because the surrogates "lack . . . an articulated, rational connection" to the taking of grizzly bears, they are inadequate.  Ariz. Cattle Growers', 273 F.3d at 1251.

Third, the statement lacks reporting to determine whether reinitiation has been triggered.  50 C.F.R. §§ 402.14(i)(1)(iv), (i)(3); Salazar, 628 F.3d at 532 (take statement without reporting "failed to establish a meaningful trigger for renewed consultation").  Although the Forest Service must report the number of years for project completion in each grizzly bear subunit under MON-NCDE-06, see FS-052039, guideline FW-GDL-IFS-01 authorizes project extensions of undefined limit with no reporting required.  FS-051946–47.  And there is no reporting to track whether a project concurrently impacts access conditions in more than three

adjacent subunits.  FS-052038–39.  Because the statement fails to provide a mechanism to retrigger consultation, it is inadequate.

>            3.      Inadequate Over-Snow Motorized Use Surrogates

The statement provides: "If late season motorized over-snow vehicle use (i.e., after March 31) occurs on more than three percent of modeled denning habitat within the PCA on the FNF, or more than 19 miles of routes are open to late season motorized over snow vehicles in modeled denning habitat, then the amount of take we anticipated in this biological opinion would be exceeded, and reinitiation or project-specific consultation would be required."  USFWS_002069.  These surrogates are illegal for three reasons.

First, because the surrogates authorize a level of take coextensive with the scope of the project, without limitation, they violate the ESA.  See Or. Nat. Res. Council v. Allen, 476 F.3d 1031, 1038–41 (9th Cir. 2007).  The statement allows for all take due to late-season snowmobiling occurring on up to three percent of modeled denning habitat within the primary conservation area and up to 19 miles of routes.  This is exactly what is authorized under the Revised Plan, FS-052893, which is unlawful.

Second, the "three percent" trigger is ambiguous because it may refer to the percent of potential denning habitat designated open to snowmobiles, regardless of whether motorists actually use it; or to the percent of potential denning habitat

identified as suitable for snowmobiles, regardless of designation or actual use; or to the percent of habitat where snowmobiles actually travel, regardless of the legality. Because the trigger is susceptible to multiple interpretations with widely varying results, the surrogates fail to set a clear standard to renew consultation.  WildEarth Guardians v. U.S. Fish and Wildlife Serv., 342 F. Supp. 3d at 1063.

Finally, because the statement lacks reporting with respect to the over-snow motorized use surrogates, it "failed to establish a meaningful trigger for renewed consultation."  Salazar, 628 F.3d at 532.  The only relevant component, MON-NCDE-08, does not monitor for miles of routes open to over-snow vehicles during the den emergence period.  FS-052039.  Therefore, the surrogate is inadequate.

### F.  The Fish and Wildlife Service Unlawfully Omitted an Incidental Take Statement for Bull Trout (WildEarth Guardians Claim 2, Count I)

The Fish and Wildlife Service failed to provide an incidental take statement for bull trout or its critical habitat, in violation of the ESA.  USFWS_001960; 16 U.S.C. § 1536(b)(4) (if the Service concludes the action will not result in jeopardy, it "shall provide . . . a written statement"); Bennett v. Spear, 520 U.S. 154, 158 (1997).  The Service admits the Revised Plan "allows for future activities that may adversely affect bull trout and designated bull trout critical habitat, including vegetation management, and road construction, use, and maintenance . . . ."  USFWS_001960.  However, it points to the programmatic nature of the plan and

defers any take statement to future, project-specific consultation.  Id.  Courts have

rejected this reasoning.  See Ctr. for Biological Diversity v. U.S. Fish and Wildlife

Serv., 623 F. Supp. 2d 1044, 1053–55 (N.D. Cal. 2009) (holding "a programmatic

forest plan does have an effect upon subsequent land use decisions and therefore

the land itself" and thus required an incidental take statement); Nat. Res. Def.

Council v. Evans, 279 F. Supp. 2d 1129, 1184 (N.D. Cal. 2003).  Because the

opinion does not contain a take statement, it violates the ESA.

Nor did the Fish and Wildlife Service provide a surrogate or explanation for

why a quantifiable limit was not feasible.  While the reinitiation notice states

consultation will be triggered if "the amount or extent of incidental take is

exceeded," the opinion provides no quantifiable limit nor adequately explained

surrogate to discern when this trigger has been met.  The Service's attempt to

short-cut the incidental take caused by the Revised Plan by deferring to future, site-

specific consultation fails to comply with the ESA.

G.     **The Forest Service Violated the ESA by Relying on the Fish and Wildlife Service's Unlawful Biological Opinion (Swan View Coalition Claims 1 and 2, WildEarth Guardians Claim 2, Count II)**

For its part, the Forest Service violated the ESA by approving the Revised

Plan in reliance on the Fish and Wildlife Service's flawed Biological Opinion to

conclude that the plan will not jeopardize the grizzly bear, bull trout, or Canada

lynx, or harm or destroy bull trout and Canada lynx critical habitat.  See FS-

38

054746; 16 U.S.C. § 1536(a)(2).  "Under ESA § 7, the Forest Service has an independent obligation to ensure that actions it authorizes … will not jeopardize listed species or destroy or adversely modify their critical habitat."  Save Our Cabinets, 255 F. Supp. 3d at 1063.  Accordingly, where the Forest Service relies on a Biological Opinion that fails to consider or even acknowledge critical issues, the Forest Service itself violates the ESA.  Id.

This is particularly so where, as here, the Forest Service "fail[s] to discuss information that would undercut the opinion's conclusions."  Ctr. for Biological Diversity, 698 F.3d at 1128.  Here, the Forest Service failed to discuss, among other things, its own data from 2015—as well as Plaintiff Swan View Coalition's 2004 road-closure report—indicating that minimal barriers placed at road entrances, such as those permitted for roads deemed "impassable" under the Revised Plan, frequently failed to preclude motor-vehicle trespass.  See Section I.A.3, supra.  The Forest Service could not lawfully ignore this evidence and simply assume that such minimal barriers would effectively prohibit use of purportedly "impassable" roads under the Revised Plan.  Cf. All. for Wild Rockies v. Probert, 412 F. Supp. 3d 1188, 1204 (D. Mont. 2019) (holding reinitiation of ESA consultation required where biological opinion failed to consider "temporary mileage increases caused by ineffective closures" of roads in grizzly habitat),

appeal dismissed sub nom. All. For Wild Rockies v. Benson, 2020 WL 3443468

(9th Cir. 2020).

## II. THE FOREST SERVICE VIOLATED NEPA BY FAILING TO EVALUATE OR DISCLOSE ITS WEAKENING OF ROAD-MANAGEMENT STANDARDS (SWAN VIEW COALITION CLAIMS 3 AND 4)

In addition to violating the ESA, the Forest Service violated NEPA's

requirement that agencies take a "hard look" at all the expected environmental

impacts of their actions threatening a significant impact on the human

environment.  See 42 U.S.C. § 4332(2)(C).  "NEPA's 'hard look' obligation

requires agencies to consider potential environmental impacts, including all

foreseeable direct and indirect impacts, and should involve a discussion of adverse

impacts that does not improperly minimize negative side effects."  WildEarth

Guardians v. U.S. Bureau of Land Mgmt., 2020 WL 2104760, at *3 (D. Mont.

2020) (quotations and citations omitted).

The Forest Service EIS for the Revised Plan violated this NEPA obligation.

First, the agency failed to consider or disclose the Revised Plan's abandonment of

Amendment 19's road-density standards and stringent road-reclamation

requirements or its resulting impact on grizzly bears, instead simply asserting that

the Revised Plan will "retain levels of open or total road densities and secure core

that have supported grizzly bear recovery on the Flathead National Forest."  FS-

053069 (Final EIS); see Section I.A, supra.  This discussion failed to analyze or

disclose the consequences of forgoing additional road reclamation required by Amendment 19 and substituting the Revised Plan's weakened road-closure requirements for Amendment 19's standards requiring comprehensive treatment of forest roads, including removal of culverts, to ensure that such routes "no longer function as a road or trail." FS-178393. This discussion also failed to examine the Revised Plan's reversal of Amendment 19's proscription against high-use non-motorized routes in "security core" grizzly bear habitat. See SOF ¶ 81. Such high-use routes displace bears, USFW_002009, and "affect the risk of grizzly bear human conflicts," which "can pose risks to human safety, as well as, safety to grizzly bears," USFWS_002032, but the Forest Service failed to evaluate the harm caused by allowing unlimited development of such routes in "security core" grizzly habitat. Yet NEPA's "hard look" requirement does not permit "a soft touch or brush-off of negative effects." Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1241 (9th Cir. 2005).

The Forest Service's EIS similarly failed to grapple with or disclose the Revised Plan's impacts to bull trout, ignoring the impact of discarding Amendment 19's road-density and culvert-removal requirements and asserting that, under guideline FW-GDL-CWN-01, "there would be no net increase in the length of roads and stream crossings inside riparian management zones for watersheds within the conservation watershed network." FS-052434 (Final EIS). This

analysis ignored the key points that the guideline is not binding and that the

geographic scope of the "conservation watershed network" is narrower than the

scope of pre-existing protections for bull trout habitat.  The Forest Service

therefore violated NEPA.

### III.  THE FOREST SERVICE UNLAWFULLY INTERPRETED THE TRAVEL MANAGEMENT RULE TO AVOID COMPLIANCE WITH THE MINIMIZATION CRITERIA (WILDEARTH GUARDIANS CLAIM 1, COUNT I)

The Forest Service's determination that it completed winter travel planning

by adopting 2006 snowmobile designations in its 2018 Revised Plan, without

ensuring compliance with the Travel Management Rule or Executive Order 11644

minimization criteria, is arbitrary and capricious.  Under the Forest Service's

interpretation of Subpart C, the agency may adopt the 2006 designations without

considering whether they comply with Executive Order 11644 or the Travel

Management Rule. FS-045677 (Subpart C "does not require the Forest to revisit

previously completed over-snow motor vehicle use designations.").  This

interpretation is unlawful for two reasons.

First, the Forest Service's interpretation conflicts with the plain language of

Executive Order 11644.  37 Fed. Reg. 2,877 (Feb. 8, 1972) at § 3(a) ("designation

of such areas and trails shall be in accordance with" minimization criteria).

Moreover, it has been rejected by the courts.  In Nat'l Wildlife Fed'n v. Morton,

the court rejected Bureau of Land Management rules that declared all public land

not restricted or closed to off-road vehicle use remained open to off-road vehicle use.  393 F. Supp. 1286, 1288–92 (D.D.C. 1975).  As in Morton, here, too, the Forest Service's interpretation would allow it to adopt winter motorized designations without evaluating compliance with Executive Order 11644.  Id. at 1294.  The Forest Service's interpretation deserves no deference because it is plainly erroneous.  Lands Council v. Powell, 395 F.3d 1019, 1034 (9th Cir. 2005) (denying deference to Forest Service's interpretation of its forest plan standards where "neither the scope nor the effect of the two standards is ambiguous"); Kisor v. Wilkie, 139 S. Ct. 2400, 2414–18 (2019).

Second, the agency failed to ensure the decade-old snowmobile designations comply with the Travel Management Rule, despite recent fundamental changes to winter travel planning.  In Winter Wildlands Alliance v. U.S. Forest Serv., the court rejected the Forest Service's attempt to exempt over-snow vehicles from the 2005 Travel Management Rule planning requirements.  2013 WL 1319598 (D. Idaho 2013).  In response, the Forest Service issued Subpart C.  80 Fed. Reg. 4,500 (amending the Travel Management Rule to require designation of roads, trails, and areas on forest system lands for over-snow vehicle use).  The Forest Service's interpretation here attempts the same side-step the court rejected in Winter Wildlands Alliance.

For example, the 2006 designations failed to designate winter motorized use for the entire forest.  Compare 37 Fed. Reg. 2,877, § 3(a) (requiring designation of "all public lands") and 36 C.F.R. §§ 212.80, 212.81, 261.14 with FS-111711 (rejecting proposed alternative to "restrict snowmobiling to designated routes and play areas forest-wide").  The designations allow winter motorized use except where prohibited, SOF ¶ 115, contrary to the "closed unless designated open" approach required by Executive Order 11644 and the Travel Management Rule.  See 42 Fed. Reg. 26,959 (May 24, 1977) ("closed to use by off-road vehicles except those areas or trails which are suitable and specifically designated as open"); 36 C.F.R. § 212.80(a) ("Over-snow vehicle use off designated roads and trails and outside designated areas is prohibited by 36 CFR 261.14.").

Additionally, the Forest Service failed to demonstrate how it located the 2006 designations to minimize damage to natural resources, harassment of wildlife or significant disruption of wildlife habitats, or conflicts between users as required by the Travel Management Rule.  Compare 37 Fed. Reg. 2,877, § 3(a) ("designation of such areas and trails shall be in accordance with" the minimization criteria) and 36 C.F.R. §§ 212.55(b), 212.81(d) with SOF ¶ 116–17. The law requires the Forest Service to demonstrate in the record how it considered and applied the minimization criteria on route-by-route or area-by-area bases. WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d at 932 (listing cases

44

and holding that the "Forest Service must apply the data it has compiled to show how it designed the areas open to snowmobile use 'with the objective of minimizing'" impacts).  Neither the 2006 Record of Decision authorizing the designations nor its EIS even mention the minimization criteria—much less demonstrate compliance.  See FS-110249–90; FS-111686–936.  Likewise, the 2018 decision for the Revised Plan that adopted the 2006 designations did not consider whether, or demonstrate how, the designations comply with the minimization criteria.  FS-054761–63 (addressing minimization criteria for suitability but not site-specific designations); FS-045677.  The Forest Service's interpretation that would allow it to adopt prior designations that run contrary to Executive Order 11644 and the Travel Management Rule is arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## IV.   THE COURT SHOULD VACATE THE UNLAWFUL AGENCY ACTIONS AND PLAN PROVISIONS

To remedy the Federal Defendants' ESA, NEPA, and Travel Management Rule violations, this Court should vacate the challenged Biological Opinion and EIS.  See 5 U.S.C. § 706(2)(A) ("reviewing court shall . . . hold unlawful and set aside" unlawful agency action); All. for the Wild Rockies v. U.S. Forest Serv., 907 F.3d 1105, 1121 (9th Cir. 2018) (vacatur is presumptive remedy).

In addition, this Court should vacate those portions of the Revised Plan and associated Record of Decision that violate the ESA, NEPA, or Travel Management

Rule.  While vacatur of an unlawful agency action in its entirety is the presumptive

remedy, "where equity requires, a court may fashion a more limited remedy upon

weighing the seriousness of the agency's errors against the disruptive

consequences of delay."  Helena Hunters & Anglers Ass'n v. Marten, 2020 WL

3577086, at *20 (D. Mont. 2020) (vacating part of Forest Service logging project

authorization) (quotations and citations omitted); see N. Plains Res. Council v.

U.S. Army Corps of Eng'rs, 2020 WL 3638125, at *3 (D. Mont. 2020)

(recognizing equitable "discretion where appropriate to order partial, rather than

complete, vacatur").  Here, the Revised Plan includes scores of provisions

unrelated to the challenged agency determinations, many of which are

environmentally beneficial and should not in equity be vacated.  See Pollinator

Stewardship Council v. U.S. Envtl. Prot. Agency, 806 F.3d 520, 532 (9th Cir.

2015) (directing that remedial determination should consider whether vacatur

"could result in possible environmental harm").  By contrast, the challenged

provisions of the Revised Plan and Record of Decision result from serious agency

errors that threaten harm to species protected under the ESA, while any disruptive

consequences are minimized by the limited nature of the requested vacatur.  See N.

Plains Res. Council, 2020 WL 3638125, at *4 (stating that, in applying vacatur

analysis, "court should tip the scales in favor of the endangered species under the

ESA's 'institutionalized caution' mandate") (citation omitted).  Plaintiffs' Motion

for Summary Judgment, filed with this Brief, details the provisions for which vacatur is requested.

With the challenged provisions vacated, the longstanding protections of Amendment 19 and other measures that were repealed by the challenged provisions of the Revised Plan should be reinstated.  See Organized Vill. of Kake v. U.S. Dept. of Agric., 795 F.3d 956, 970 (9th Cir. 2015) (en banc) ("The effect of invalidating an agency rule is to reinstate the rule previously in force.") (quotations and citation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs in these consolidated cases respectfully request that this Court grant their motion for summary judgment and vacate the challenged Biological Opinion, EIS, and provisions of the Revised Plan and associated Record of Decision.

Respectfully submitted this 5th day of August, 2020.


/s/ Marla Fox

Marla Fox
*admitted pro hac vice*
WildEarth Guardians
P.O. Box 13086
Portland, OR 97213
Ph: (651) 434-7737
mfox@wildearthguardians.org

*Counsel for Plaintiff WildEarth Guardians*

/s/ Kelly E. Nokes

Kelly E. Nokes
(Mont. Bar No. 39465862)
Western Environmental Law Center
208 Paseo del Pueblo Sur, No. 602
Taos, NM 87571
Ph: (575) 613-8051
nokes@westernlaw.org

/s/ Susan Jane Brown

Susan Jane M. Brown
*admitted pro hac vice*
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
Ph: (503) 680-5513
brown@westernlaw.org

/s/ John R. Mellgren

John R. Mellgren
*admitted pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd.

Ste. 340
Eugene, OR 97401
Ph: (541) 359-0990
mellgren@westernlaw.org

*Counsel for Plaintiffs WildEarth*
*Guardians and Western Watersheds*
*Project*

/s/ Timothy J. Preso
Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax
tpreso@earthjustice.org

*Counsel for Plaintiffs Swan View*
*Coalition and Friends of the Wild*
*Swan*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that this brief complies with Local Rule 7.1(d)(2) because it contains 9,868 words, excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and certificate of service.

/s/ Timothy J. Preso
Timothy J. Preso

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2020, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy to be served on all counsel of record.

/s/ Timothy J. Preso
Timothy J. Preso